Filed 4/28/16 (unmodified opinion attached)

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JORGE GONZALEZ et al.,<br><br>    Defendants and Appellants. | B255375<br><br>(Los Angeles County<br>Super. Ct. No. YA076269)<br><br>ORDER MODIFYING OPINION<br>AND DENYING PETITIONS FOR<br>REHEARING<br>[NO CHANGE IN JUDGMENT] |

THE COURT*

It is ordered that the published opinion filed March 30, 2016, be modified as follows:

1. On page 5, the ninth sentence in the first full paragraph beginning with "Kalac did not want to give . . . ." is deleted. The remainder of the paragraph is deleted and the following two sentences are inserted in its place as follows:

> He gave Estrada $30, but did so unwillingly. He did not intend
> to assist or facilitate the robbery.

2.  On page 9, the first two sentences under section 4 beginning with "Inglewood Police Officer Fernando Vasquez . . . ." are deleted.  The following sentence is inserted in their place as follows:

> Inglewood Police Officer Fernando Vasquez responded to a
> 2:36 p.m. 911 call, arriving with his partner at Rosales's house
> at 2:40 pm.

3.  On page 10, the third sentence in the first paragraph, beginning with "Ahir also provided . . . ." is deleted.  The following sentence is inserted in its place:

> Ahir also provided police with video surveillance footage for
> October 6.

4.  On page 10, the fifth sentence in the first paragraph, beginning with "At 2:17 p.m., the video . . . ." is deleted.  The following is inserted in its place:

> At 2:17 p.m., the video shows multiple individuals entering a
> black Cadillac and at 2:21 p.m., it shows them driving away
> from the hotel.  Inglewood Police Detective Kevin Lane, who
> conducted two test drives, testified it took between three
> minutes, 44 seconds and five minutes, five seconds to drive
> from the Crystal Inn to the American Inn, due to traffic and
> signal lights.

5.  On page 10, after the second sentence beginning with "The registration form . . . ." in the second paragraph, the following sentence is added:

> Based on his test drive, Detective Lane testified it took
> approximately 30 seconds to drive from the American Inn to
> the laundromat, or two to three minutes to walk to the location.

6.  On page 11, after the fifth sentence beginning with "When asked if she had used . . . ." in the first full paragraph, the following sentence is inserted:

2

In another call with Davalos, Estrada stated that Ruiz had misdescribed her clothing, as she had been wearing pajamas.

7.  On page 14, the heading for section A is deleted and the following heading is inserted:

> *The Trial Court did not Err in Admitting Ruiz's Out-Of-Court Statements.*

8.  On page 16, the second sentence beginning with "Ruiz was shot between …." in the first full paragraph is deleted and the following sentence and footnote number 2 inserted in its place:

Rosales was shot between 2:28 p.m. -- the last time his cell phone was used -- and 2:36 p.m. -- the time of the 911 call.[insert footnote 2]

[Footnote 2] Estrada contends that Rosales might have been killed earlier, arguing that Ruiz could have used Rosales's cell phone to call Jennifer's cell phone after Rosales was killed.  No evidence supports this contention.

9.  On page 16, the third sentence beginning with "Officer Vasquez . . . ." in the first full paragraph is deleted and the following sentence is inserted in its place:

Officer Vasquez arrived at Rosales's house four minutes later, and promptly spoke with Ruiz.

10.  On page 30, the entire section F is deleted and the following section F is inserted in its place:

The jury was instructed that in order to return true findings on the robbery special circumstance allegation for a defendant who was not the actual killer, the prosecution was required to prove:  (1) that the defendant's participation in the crime began before or during the killing; (2) that the defendant was a major participant in the crime; and (3) that when the defendant participated in the crime, he or she acted with reckless indifference to human life.  The jury returned true findings on the special circumstance as to all appellants.

3

Appellants Estrada and Garcia contend there was insufficient evidence to support the jury's true findings on the robbery special circumstance. On this issue, we draw guidance from *Banks*, *supra*, 61 Cal.4th 788.[5] *Banks* involved a defendant, Matthews, who was found guilty of first degree murder under a felony-murder theory, based on evidence that he was the getaway driver following an armed robbery. (*Id*. at p. 794.) As Matthews was not the actual killer, the court addressed whether he was liable for life imprisonment without the possibility of parole under section 190.2, subdivision (d). The section provides: "[E]very person, not the actual killer, who, with reckless indifference to human life and as a major participant, aids, abets, counsels, commands, induces, solicits, requests, or assists in the commission of a felony enumerated in paragraph (17) of subdivision (a) which results in the death of some person or persons, and who is found guilty of murder in the first degree therefor, shall be punished by death or imprisonment in the state prison for life without the possibility of parole if a special circumstance enumerated in paragraph (17) of subdivision (a) has been found to be true under Section 190.4." (§ 190.2, subd. (d).) "The statute thus imposes both a special actus reus requirement, major participation in the crime, and a specific mens rea requirement, reckless indifference to human life." (*Banks*, *supra*, 61 Cal.4th at p. 798, fn. omitted.) These two requirements -- being a major participant and having a reckless disregard for human life -- will often overlap. (*Tison v. Arizona* (1987) 481 U.S. 137, 158 & fn. 12.)[6]

---

[5]    *Banks* was published after appellants filed their opening briefs, and its holding was first addressed in appellants' reply brief. We requested and received supplemental letter briefs on the applicability of *Banks* to the facts of this case.

[6]    As Gonzalez was the actual killer, he is not entitled to the analysis set forth in *Banks*. Instead, under section 190.2, subdivision (b), he is statutorily eligible for life imprisonment without the possibility of parole. (See § 190.2, subd. (b) ["[A]n

4

After stating that "Matthews's culpability for first degree felony murder is not in dispute" (*Banks*, *supra*, 61 Cal.4th at p. 794), the court set forth nonexclusive factors relevant to determining whether an accomplice was statutorily eligible for life imprisonment without the possibility of parole under section 190.2, subdivision (d). These factors include: "What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death? What did the defendant do after lethal force was used?" (*Banks*, at p. 803, fn. omitted.) The court reiterated that "[n]o one of these considerations is necessary, nor is any one of them necessarily sufficient." (*Ibid.*)

Applying those factors to the case, the court found that while there was substantial evidence Matthews acted as the getaway driver, "[n]o evidence was introduced establishing Matthews's role, if any, in planning the robbery. No evidence was introduced establishing Matthews's role, if any, in procuring weapons." (*Banks*, *supra*, 61 Cal.4th at p. 805, fn. omitted.) "During the robbery and murder, Matthews was absent from the scene, sitting in a car and waiting. There was no evidence he saw or heard the shooting, that he could have seen or heard the shooting, or that he had any immediate role in instigating it or could have prevented it." (*Ibid.*) The court concluded that on this record, "Matthews was, in

---

actual killer, as to whom the special circumstance has been found to be true under Section 190.4, need not have had any intent to kill at the time of the commission of the offense which is the basis of the special circumstance in order to suffer death or confinement in the state prison for life without the possibility of parole."].)

5

short, no more than a getaway driver" and "cannot qualify as a major participant under section 190.2(d)." (*Id*. at pp. 805 & 807.) As to mens rea, the court noted that although there was evidence Matthews knew he was participating in an armed robbery, nothing suggested he knew his actions would involve a grave risk of death. "Because nothing in the record reflects that Matthews knew there would be a likelihood of resistance and the need to meet that resistance with lethal force," the evidence failed to show Matthews acted with reckless indifference to human life. (*Id*. at pp. 807, 811.)

We also find instructive cases involving accomplices who were not mere getaway drivers. In *People v. Smith* (2005) 135 Cal.App.4th 914, three men (Smith, Taffolla, & Felix) planned to rob a woman. After going to the victim's hotel room, Taffolla stayed outside to act as a lookout, while Smith went inside and Felix left to prepare the getaway vehicle. An altercation occurred in the room, during which the victim was stabbed multiple times, beaten in the face with a steam iron, and slammed into the wall. After Smith exited the room covered in blood, he and Taffolla ran to a nearby street, where Felix picked them up. (*Id*. at pp. 919-920 & 927.) The appellate court held the evidence supported the jury's finding that Taffolla was a major participant, as he was one of only three perpetrators and served as the only lookout to a "violent attempted robbery-turned-murder." (*Id*. at p. 928.) The court concluded the evidence also supported the finding that Taffolla acted with reckless indifference to human life, as he would have heard the victim being assaulted, and after seeing Smith leave the room covered in blood, he chose to flee with the assailant rather than come to the victim's aid or summon help. (*Id*. at pp. 927-928.)

In *People v. Lopez* (2011) 198 Cal.App.4th 1106 (*Lopez*), overruled in part by *Banks*, *supra*, 61 Cal.4th at page 809, footnote 8, appellant Brousseau, a prostitute, along with several codefendants, planned to rob ("com[e] up on") some

6

of her prospective customers. (*Lopez*, at pp. 1110 & 1112.) During the encounter, the victim was shot and killed by codefendant Lopez. Brousseau did not challenge the jury's finding that she was a major participant, but argued there was insufficient evidence to prove she acted with reckless indifference to human life. The appellate court disagreed. It found that "Brousseau's act of luring the victim into the secluded alley was critical to the robbery's success. After hearing what she knew was a gunshot, she failed to help the victim or call 911." Instead, she spent the night with her codefendants and had sex with Lopez. The appellate court found Brousseau's actions reflected an "utter indifference to the victim's life." (*Id.* at p. 1117.)[7]

Following *Banks*, in *People v. Medina* (2016) 245 Cal.App.4th 778, the appellate court found there was sufficient evidence to show an accomplice (Whitehead) who acted as armed backup for a robbery was a major participant and acted with reckless indifference to human life. Although Whitehead was not involved in planning the robbery, when he learned of the plan, he asked to go and participated fully. Whitehead left before the victim was shot, in order to drive the shooter's girlfriend away from the scene. When he heard the shooting, he returned to aid the shooter while making no effort to determine if anyone was injured or to offer aid. (*Id.* at pp. 792-793.)

Here, there was substantial evidence that Estrada and Garcia were major participants and acted with reckless indifference to human life. (See *Banks*, *supra*, 61 Cal.4th at p. 804 [in reviewing sufficiency of evidence supporting special circumstance allegation, appellate court considers the record in light most

---

[7]     Although in *Banks*, the court held that Brousseau's knowledge that Lopez was armed, standing alone, was insufficient to establish reckless indifference to human life, it declined to overrule *Lopez*. (*Banks*, *supra*, 61 Cal.4th at p. 809, fn. 8.)

favorable to the judgment].)  Estrada was identified as the person who first proposed robbing Rosales.  When she did so, she informed Gonzalez and Garcia that Rosales was a drug dealer who had been physically violent in the past.  Thus, unlike in *Banks*, there was a substantial probability the robbery would result in resistance and the need to meet that resistance with deadly force.  Estrada then set up the robbery by calling Rosales and asking him to meet her at the laundromat.  Her act of luring Rosales to the laundromat was "critical to the robbery's success." (*Lopez*, *supra*, 198 Cal.App.4th at p. 1117.)  Estrada also was identified as being at the scene, and pointing Rosales out to the shooter.[8]  After a shot was fired, she neither called 911 to assist the victim, nor called the police to report the shooting.[9]  Rather, like Brousseau in *Lopez*, Estrada spent the afternoon with the shooter.  She took Gonzalez to her home to introduce him to her son, and was arrested with him later that evening.  On this record, there was sufficient evidence for the jury to find that Estrada was a major participant and acted with reckless indifference to human life.

---

[8]      Contrary to her contention, it was not physically impossible for Estrada to have been present at the shooting.  She left the Crystal Inn at 2:21 p.m., and drove to the American Inn, which took approximately four minutes.  After checking into the hotel, she received a phone call from Rosales at 2:28 p.m. and left shortly thereafter.  As it took only 30 seconds to drive to the location, Estrada could have been present when Rosales was shot.  In her recorded call with her aunt, Estrada said Ruiz had inaccurately described her clothing, but did not deny being at the scene.

[9]      Although the jury found not true the allegation that a principal was armed with a firearm, we may consider Ruiz's account of Gonzalez's use of a gun to support an enhancement.  (See *People v. Medina*, *supra*, 245 Cal.App.4th at p. 791, fn. 4 [for purposes of finding special circumstance under section 190.2, subdivision (d), "jury could consider evidence that Medina was armed and used his gun even though the jury acquitted Medina of the personal use of a firearm enhancement"].)

Likewise, Garcia was present when Estrada proposed robbing Rosales and described his violent nature. There was evidence he participated in the planning of the robbery with Estrada and Gonzalez and volunteered to assist as a lookout. His phone records showed calls to Rosales shortly before the murder. Garcia was present at the scene, "in a position to facilitate or prevent the actual murder." (*Banks*, *supra*, 61 Cal.4th at p. 803.) He made no attempt to prevent the shooting or to notify authorities after Rosales was shot. Like Taffolla in *Smith*, Garcia chose to flee with the shooter, rather than come to Rosales's aid or summon help. He also accompanied Gonzalez when he disposed of the murder weapon. On this record, we find sufficient evidence to support the jury's findings that Garcia was a major participant and acted with reckless indifference to human life.

The petitions for rehearing is denied. The modification does not change the judgment.

_____

*EPSTEIN, P. J.       WILLHITE, J.       MANELLA, J.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B255375 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. YA076269) |
| v. | |
| JORGE GONZALEZ et al., | |
| Defendants and Appellants. | |

APPEAL from judgments of the Superior Court of Los Angeles County, Scott T. Millington, Judge. Affirmed with directions.

Robert Franklin Howell, under appointment by the Court of Appeal, for Defendant and Appellant Jorge Gonzalez.

Valerie G. Wass, under appointment by the Court of Appeal, for Defendant and Appellant Erica Michelle Estrada.

Jonathan E. Demson, under appointment by the Court of Appeal, for Defendant and Appellant Alfonso Garcia.

Kamala D. Harris, Attorney General, Gerard A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Steven D.

Matthews and Roberta L. Davis, Deputy Attorneys General, for Plaintiff and Respondent.

_____

**INTRODUCTION**

Appellants Jorge Gonzalez, Erica Michelle Estrada, and Alfonso Garcia appeal from judgments and sentences following their convictions for the murder of Victor Rosales under a felony-murder theory. Appellants challenge the trial court's evidentiary rulings, its jury instructions and their sentences. They contend the trial court erred in admitting the statements of an unavailable percipient witness under the spontaneous statement exception to the hearsay rule. They also contend the court erred in instructing the jury to determine whether a prosecution witness was an accomplice, and argue that the purported accomplice's testimony was not sufficiently corroborated. Appellants further argue that because the information charged them with malice murder, they were entitled to instructions on malice murder, its lesser included offenses and the defenses of accident and self-defense. Estrada and Garcia contend they were improperly sentenced to life imprisonment without the possibility of parole because the jury's true findings on the robbery special circumstance enhancement were not supported by sufficient evidence. Finally, they contend the abstracts of judgment improperly reflect imposition of a parole revocation restitution fine.

With the exception of the claim regarding the parole revocation fines, we reject appellants' contentions. The record supports the trial court's admission of the percipient witness's remarks as spontaneous statements, as they were made shortly after the shooting of Rosales, while the witness was under the influence of that startling event, and were not testimonial. As to the alleged accomplice, we conclude that he was not an accomplice as a matter of law, and that the trial court

2

properly instructed the jury to determine the issue. Moreover, any error was harmless, as the alleged accomplice's testimony was sufficiently corroborated.

With respect to the trial court's failure to instruct, sua sponte, on malice murder, its lesser included offenses and defenses, we conclude that in light of the jury's guilty verdicts on felony murder and its true findings on the robbery special circumstance allegations, any error was harmless. To the extent *People v. Campbell* (2015) 233 Cal.App.4th 148 (*Campbell*) suggests a different analysis, we respectfully disagree. Finally, we conclude that under *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*), there was sufficient evidence to support the jury's true findings as to all appellants on the robbery special circumstance allegation. Thus, appellants were statutorily eligible to be sentenced to life imprisonment without the possibility of parole. Accordingly, we affirm the convictions and modify the abstracts of judgment to delete the parole revocation fines. As amended, the judgments are affirmed.

## PROCEDURAL HISTORY

Appellants were charged in a second amended information with the malice murder of Rosales (Pen. Code, §187, subd. (a); count 1).[10] As to all appellants, it was alleged that a principal was armed with a firearm (§ 122022, subd. (a)(1)), and that the murder occurred during the commission of a robbery (§ 190.2, subd. (a)(17)). Gonzalez was also charged with shooting at an occupied vehicle. (§ 246; count 2.) As to both counts, it was alleged that Gonzalez personally and intentionally discharged a firearm which caused great bodily injury and death to Rosales (§ 12022.53, subds. (b), (c) & (d)).

A jury found appellants guilty on count 1, found true the robbery special-circumstance allegation, and found not true the firearm allegations. The jury

---

[10] All further statutory citations are to the Penal Code, unless otherwise stated.

3

acquitted Gonzalez of count 2. The trial court sentenced each appellant to life imprisonment without the possibility of parole.

Appellants filed timely notices of appeal.

## FACTUAL BACKGROUND

A. *The Prosecution Case*

1. *Anthony Stephen Kalac's Testimony*

After asserting his Fifth Amendment right against self-incrimination at trial, Anthony Stephen Kalac was granted use immunity.[11] He testified that on October 6, 2009, he went to Garcia's house to get high. He had known Garcia for several years. At the house, Garcia introduced Kalac to his girlfriend, Jennifer. Kalac, who already had taken 10 "hits" of heroin, began smoking several more.

Garcia announced they were going to a hotel down the street to celebrate "somebody's girlfriend's birthday." Kalac left his heroin stash at Garcia's house. Garcia, Kalac and Jennifer then walked to the Crystal Inn, which was nearby on Prairie and 112th Street.

At the Crystal Inn, Garcia knocked on a door of a second floor room. Gonzalez opened the door. Garcia introduced Kalac to Gonzalez and to the other occupant -- Gonzalez's girlfriend, Estrada. Kalac entered and sat on a couch while the other occupants began speaking among themselves. Garcia told Gonzalez, "Let's pack a bolt," which referred to putting methamphetamine into a pipe to smoke. Gonzalez replied that there were no drugs in the room. Garcia, Gonzalez, and Estrada then discussed where they could obtain drugs. Kalac left the hotel to meet his heroin dealer at a nearby location. When the dealer did not show up,

---

[11]     Use immunity precludes prosecutors from using a witness's testimony in a later proceeding. A witness granted use immunity may still be prosecuted based on other evidence obtained independently.

4

Kalac returned to the hotel room. Garcia, Gonzalez, Estrada and Jennifer were still present.

Estrada told Garcia and Gonzalez that she had someone they could "come up on." Kalac understood "come up on" to mean "rob." Estrada said the proposed robbery victim was a drug dealer. She also mentioned he was an ex-boyfriend who had been "physical" with her. At this point, Gonzalez became "agitated." Estrada, Garcia, and Gonzalez began talking about robbing the person Estrada had mentioned. Because no one in the room had money, Erica asked Kalac for money to pay for a room at a hotel next door. She stated she would give Kalac heroin from the robbery in return for the money. Kalac did not want to give Estrada the money because he already had heroin stashed at Garcia's house. He gave Estrada $30, but did so unwillingly. He also denied intending to assist or facilitate the robbery.

Estrada then told everyone to be quiet so she could call the drug dealer. She told the dealer to meet at the laundromat across the street in 30 minutes. After the conversation, Garcia and Gonzalez left for the laundromat. Garcia said he would act as a lookout. Kalac never saw a gun or heard guns discussed.

Estrada called the drug dealer again to find out when he would arrive at the laundromat. After this call, Estrada began packing to move out of the hotel. Kalac and Jennifer helped Estrada load the bags into her car, a black Cadillac. They drove to the American Inn, just south of the Crystal Inn. Responding to a phone call, Estrada said she would "be there in two minutes," and left shortly thereafter with Jennifer, leaving Kalac in the hotel room.

After several minutes, Kalac decided to go home. He was walking south on Prairie Street when he saw Garcia and Gonzalez on the other side of the street. Garcia crossed the street and told Kalac that "shit went bad." Kalac and Garcia then walked to the American Inn. Garcia changed his clothes, and the two men

5

walked to Garcia's house, where Kalac retrieved his heroin and left for home. He denied seeing or handling the gun used to shoot Rosales. In February or March 2010, Kalac encountered Jennifer. She told him the drug dealer had died.

2. *Other Evidence Concerning Kalac*

Inglewood Police Officer Michael Han testified that on February 1, 2010, an informant who requested anonymity came to the police station, stating she had information about a murder. Officer Han spoke with the informant and later sent out a group e-mail to all homicide detectives. The email stated: "'For your information, on Monday, February 1, 2010, I met with an anonymous informant at the IPD Lobby. The informant said he/she heard the following story from a male white subject by the name of Anthony Kalac. The informant relayed that recently he/she heard Anthony Kalac talk about a robbery to a drug dealer. Anthony Kalac said a male subject by the name of "Ralph" or "Alf" was the mastermind in the robbery. On or about October, 2009, "Ralph," Anthony Kalac, and two other subjects (one male and one female) executed the robbery. Anthony Kalac said "Ralph" shot and killed the drug dealer, who was in the car, in the area of 113th Street and Prairie Avenue. After the murder "Ralph" gave the gun to Anthony Kalac to get rid of it.'"

The informant was later identified as Stefanie San Angelo. She testified she was dating Kalac in 2009. A few days before she talked with Detective Han, she had received information that Kalac might have been involved in a shooting. She could not recall whom she heard it from. She provided that information to the detective. After talking with the police, she spoke with Kalac. Kalac said he had gone to buy some drugs with "Alf and there was another guy and female there. They intended to jack somebody. It was either the girl's boyfriend, ex-boyfriend. . . . They contacted him. He came out. They went down to meet with him. [Kalac] stayed in the room. . . . He [the victim] wasn't giving it up. He

6

either tried to run away or drive away. They shot at him, hit him, and that was it." San Angelo was not sure how Kalac learned of the shooting. She had asked him, "Did you walk past a dead body and not say anything?" Kalac had responded, "Yeah, I didn't care about it. I cared about my dope." San Angelo also identified Garcia as "Alf."

### 3. *Testimony of the Victim's Family Members*

Liliana Rosales, the victim's sister, testified that in October 2009, she was living in a house with her brother, sister, and mother. Liliana testified that her brother had been in a relationship with Estrada. On October 6, 2009, her brother told her he was going out, but would be "right back." Shortly thereafter, Liliana was walking out to her car when another vehicle pulled up to the house. Alejandro Ruiz was driving the vehicle. He got out, looking nervous, and told Lilliana in a "broken" voice that her brother had been shot. Liliana ran to the passenger side of the vehicle and saw her brother. He was not moving and looked asleep. She asked Ruiz "who had done that" to her brother. Ruiz said, "Erica, Erica." Some neighbors came over, and Liliana told them to call 911. She ran inside the house and got her mother. The neighbors, her mother, and Liliana pulled Rosales from the vehicle. Liliana noticed a bullet wound in Rosales's stomach. Her mother performed CPR on Rosales until the ambulance arrived. Rosales was taken to the hospital where he was pronounced dead.

Maria Murillo, the victim's mother, testified that on October 6, 2009, at around 2:10 p.m., she was coming home when she saw her son in their driveway. Rosales told her he was going to eat lunch with a friend. Murillo entered the house and began cooking. About 10 minutes later, her daughter Liliana entered and told her Rosales had been hurt. Murillo ran outside, and saw Rosales in the passenger side of a car. She also observed Rosales's friend, Alejandro Ruiz, looking "frightened" and "in despair." Ruiz was running around, saying, "the girlfriend,

7

the girlfriend" in Spanish. Some neighbors then helped her pull Rosales out of the vehicle. She performed CPR until the ambulance arrived. Murillo was later interviewed, and told the detective that Rosales had said that Estrada would call him for drugs.

Mayra Gomez, the victim's other sister, testified that she was very close to her brother. About three to four months before he died, she observed her brother with Estrada on multiple occasions, both at their house and at Estrada's house. Rosales told Gomez that "he was fooling around with [Estrada], but it was nothing serious." Gomez also stated that Rosales was "fooling around" with other people during that time. On October 6, at around 2:00 p.m., Rosales told Gomez he had to go "do something real quick and then I'm going to come back." About an hour later, Gomez heard Liliana run into the house screaming Rosales's name. Gomez ran outside and saw Ruiz standing next to a white vehicle. He looked scared and frightened, and he was stuttering. Gomez ran to the passenger side of the vehicle and saw her brother: his eyes were rolled back and there was a bloodstain on his stomach. Gomez heard Ruiz say, "It was Erica" in Spanish. When the police arrived, a detective asked Gomez if she knew "Erica." Gomez said she did, and guided police officers to Estrada's house. Gomez testified that her brother used crystal methamphetamine, and that she suspected he was a drug dealer.

4. *Testimony of Officer Fernando Vasquez*

Inglewood Police Officer Fernando Vasquez responded to the 911 call. He and his partner arrived at Rosales's house at 2:40 p.m. Vasquez saw that Rosales had a single gunshot wound to his chest. When paramedics arrived and took over treatment, Vasquez noticed Ruiz, who appeared to be in shock and looked afraid. Ruiz was pacing back and forth, his eyes were wide open, and he spoke very rapidly in broken sentences with a high-pitched voice. The officer did not believe Ruiz was under the influence of any drug.

8

When asked about the shooting, Ruiz stated he had received a call from Rosales around 1:00 p.m., asking Ruiz for a ride. Ruiz picked up Rosales at approximately 2:16 p.m. While in the car, Rosales told Ruiz he had received a call from his girlfriend, Erica. Erica wanted to meet Rosales for lunch, and had asked him to meet her at a laundromat on Prairie and 112th Street. When Ruiz and Rosales arrived at the laundromat, Ruiz parked his vehicle at the curb. As he was parking, another vehicle arrived and parked in front of him. While parking, this vehicle lightly collided with Ruiz's vehicle. Ruiz was shocked by the accident. He recognized Erica, accompanied by two male Hispanics, walking out from behind two palm trees. Erica pointed at Rosales, and one of the males walked up to the passenger side door, produced a small handgun, and fired a single shot at Rosales. The shooter then walked around the car to the driver's side, and attempted to pull Ruiz out of the vehicle. Ruiz, fearing for his life, hit the accelerator and drove away from the scene.

At around 7:14 that evening, Officer Vasquez participated in the detention and arrest of Estrada and Gonzalez, who were together in a black Cadillac outside Estrada's house. Neither Estrada nor Gonzalez showed signs of injuries.

5. *Additional Evidence*

Ramesh Ahir, the hotel manager at the Crystal Inn, testified that based on hotel records, Estrada registered for room 232 on October 5, 2009. She checked out the following day. Ahir also provided police with video surveillance footage. The video shows that at 2:06 p.m., an adult male walked past the camera towards Prairie, followed a minute later by another male. At 2:17 p.m., the video shows multiple individuals entering a black Cadillac and driving away.

Estrada then registered at the American Inn. The registration form showed $51 of the $58 room charge was paid.

9

Vadims Poukens, a medical examiner, testified he performed the autopsy on Rosales. A .22-caliber bullet was recovered from his body. Poukens opined that Rosales died from a gunshot wound to the chest. According to Poukens, when a gun is discharged, particles coming off the muzzle may strike the skin and leave small marks, called "stippling." A person would have to be close to the discharging firearm -- around 2 feet -- to show stippling. Poukens observed stippling on Rosales's right hand, in the wrist area. He observed no other signs of injuries, such as defensive wounds to the hands.

The white vehicle Ruiz had driven was impounded. A .22-caliber cartridge case was found in the vehicle. Rosales's cellular phone was recovered between the center console and passenger side seat.

Phone records showed numerous calls between and among appellants and Rosales on October 6, 2009. At 2:12 p.m., a call was made from Garcia's cell phone to Rosales's phone. At 2:19 p.m. and 2:21 p.m., calls were made from Jennifer's cell phone to Garcia's phone. At 2:23 p.m., a call was made from Rosales's phone to Garcia's phone. At 2:23 p.m. and 2:26 p.m., two more calls were made from Jennifer's phone to Garcia's phone. At 2:27 p.m., a call was made from Garcia's phone to Rosales's phone. At 2:27 p.m. and 2:28 p.m., two more calls were made from Garcia's phone to Jennifer's phone. Finally, at 2:28 p.m., a call was made from Rosales's phone to Jennifer's phone. During this period, Garcia's phone was using cell towers located within one mile of the Crystal Inn.

When Estrada and Gonzalez were arrested, no weapons were found on them. During Gonzalez's booking, he had 25 cents on his person. While Estrada was in jail, she made eight calls to her aunt, Maria Davalos. During one of the recorded conversations, Estrada asked her aunt to get in touch with Jennifer, saying "[Jennifer] must have the cell phone, right[?]" When asked if she had used

10

Jennifer's cell phone to call Rosales, she said, "Yeah, I did but I called private though."

Wayne Moorehead testified he performed gunshot residue tests on swabs taken from Estrada's and Gonzalez's hands. Gunshot residue was present in Gonzales's samples, but not in Estrada's.

Garcia was arrested on December 17, 2009. When police officers tried to serve the arrest warrant, Garcia attempted to run away, but was apprehended.

B.    *The Defense Case*

Daren Blount, a private investigator working for Gonzalez's defense, testified he interviewed Liliana Rosales. Liliana told him her brother sold drugs. Liliana also stated her brother had sold drugs to Estrada at a discount, and had even given drugs to Estrada for free.

Gonzalez testified that in 2009, he was living off approximately $46,000 in savings and money earned from a part-time job assisting a paralyzed person named Ernesto Corral. A few days before the incident, Corral had paid him $200. On October 6, 2009, Gonzalez had approximately $165 on his person.

Gonzalez testified that on October 5, 2009, Estrada had surprised him with a birthday party at the Crystal Inn. Jennifer also was present at the party. Gonzales testified he had met Estrada through Jennifer. He had known her for about a month and a half before the incident. Gonzalez stated that although they were intimate, they were never romantic or serious, and he did not consider her his girlfriend. He also knew she was dating Rosales. Gonzalez had met Rosales on two prior occasions. On both occasions, he purchased drugs from Rosales, using Estrada's connection with Rosales.

After the October 5 birthday party, at around 10:00 p.m., Estrada left the hotel, saying she was going to go out with Rosales. Estrada returned to the hotel room around midnight.

11

The next morning, Garcia and Kalac came to the hotel room. Gonzalez knew Garcia because they went to the same high school. Kalac looked like he was on drugs. He came into the room and sat on the couch. Garcia asked Gonzalez to "pack a bowl," and Gonzalez replied that they had no drugs. Gonzalez then asked Estrada if she wanted to call Rosales to order a "teena" -- a 1/16th of crystal methamphetamine. Kalac then indicated he wanted to purchase $50 worth of heroin, but had only $30. Estrada told Kalac she could get him $50 worth of heroin for $30. She then called Rosales.

Gonzalez denied that anyone spoke about robbing Rosales. He did not have a gun or see any guns, and there were no discussions about guns. Gonzalez also stated they planned to move to another hotel, explaining that the hotel manager had called and said they had to leave because too many people were coming in and out of the room.

After Estrada finished speaking with Rosales, Gonzalez left the hotel to meet Rosales at the laundromat across the street. Gonzalez asked Garcia to come with him, and Garcia agreed. There was no mention of being a lookout. Gonzalez identified himself in the hotel's video surveillance footage as the first person shown exiting the hotel.

Gonzalez waited outside the laundromat for 20 to 30 minutes. He then began walking toward the corner of Prairie and 112th, where he noticed Rosales sitting in a car with the window down, looking at him. He walked over to Rosales, and said, "What's up, Victor?" Rosales did not respond. Gonzalez repeated his greeting, but Rosales remained silent. Gonzalez then asked, "Do you want me to get Erica?" Rosales responded by raising a handgun in his right hand. In fear for his life, Gonzalez grabbed the gun, and was able to take it from Rosales. Rosales tried to retrieve the gun -- now in Gonzalez's right hand -- and used both hands to grab Gonzalez's right wrist. As Gonzalez pulled away and turned his body, the

12

gun discharged. Gonzalez denied intentionally pulling the trigger or trying to kill Rosales.

Gonzalez ran from the scene and walked into the laundromat. He waited for Rosales's car to drive away. He then left the laundromat and found Garcia standing nearby. Gonzalez testified he was unsure where Garcia was when the incident occurred. Gonzalez and Garcia walked along Prairie, where they encountered Kalac. Kalac said, "We're at the American Inn. We got a room." Gonzalez then gave Kalac the gun because he was scared of retaining possession of it. He did not tell Kalac to dispose of the gun. An acquaintance who happened to be driving by the location picked up Gonzalez but not Garcia, and dropped him off at 105th Street. Gonzalez gave the man $70 and told him to tell Estrada to get another hotel room.

Gonzalez called another acquaintance to give him a ride. While in the car, Gonzalez called the first acquaintance and learned that Estrada was staying at the Deluxe Inn. He was dropped off there, and joined her in the room. Gonzalez placed his cell phone, remaining money, and other belongings inside a drawer and went to sleep. He awoke at the sound of Estrada leaving the hotel room. She told him she wanted to see her son, and Gonzalez told her he would go with her. Estrada drove Gonzalez to her house, introduced him to her son, and took her son back inside. As Gonzalez and Estrada were driving away, the police arrived and arrested them.

Corral testified that in 2009, he had hired Gonzalez for $200 a month as a caregiver.

Neither Estrada nor Garcia testified.

## DISCUSSION

Appellants contend (1) that the trial court erred in admitting Ruiz's out-of-court statements to Officer Vasquez; (2) that the court erred in permitting Kalac to

13

testify to appellants' planning of the robbery; (3) that the court erred in allowing the jury to determine whether Kalac was an accomplice; (4) that the court erred in failing to instruct, sua sponte, on malice murder, the lesser included offenses of murder, and defenses to malice murder; (5) that there was insufficient evidence to support the robbery special circumstance enhancement; and (6) that the imposition of a parole revocation fine was unauthorized. We address each contention in turn.

A. *The Trial Court did not Err in Admitting Alejandro Ruiz's Testimony.*

Ruiz was unavailable for trial. In a pretrial hearing under Evidence Code section 402, the court permitted Officer Vasquez to testify about Ruiz's statements under the spontaneous statement exception to the hearsay rule (Evid. Code, § 1240). The court found that "a murder and a shooting . . . is incredibly startling and frightening." It further found that Ruiz's statements were made before there was time to contrive and misrepresent, noting that Ruiz made his statements soon after the shooting, and that Ruiz's demeanor and behavior demonstrated he was still overcome with nervous excitement. Additionally, the court determined that Ruiz's statements to the officer were nontestimonial. The court found that Officer Vasquez was not seeking to elicit testimonial evidence for later use at trial, but asking general questions to locate an at-large shooting suspect. Appellants Estrada and Garcia contend the trial court abused its discretion in admitting Ruiz's statements, arguing (1) that the statements were made after Ruiz had sufficient time to contrive and misrepresent, that (2) they went beyond the circumstances of the shooting, and (3) that they were testimonial. We find no error in the trial court's admission of Ruiz's statements.

Evidence Code section 1240 provides: "Evidence of a statement is not made inadmissible by the hearsay rule if the statement: [¶] (a) Purports to narrate, describe, or explain an act, condition, or event perceived by the declarant; and [¶] (b) Was made spontaneously while the declarant was under the stress of

14

excitement caused by such perception." To be admissible under the spontaneous statement exception, "'(1) there must be some occurrence startling enough to produce . . . nervous excitement and render the utterance spontaneous and unreflecting; (2) the utterance must have been before there has been time to contrive and misrepresent, i.e., while the nervous excitement may be supposed still to dominate and the reflective powers to be yet in abeyance; and (3) the utterance must relate to the circumstance of the occurrence preceding it.'" (*People v. Poggi* (1988) 45 Cal.3d 306, 318 (*Poggi*), quoting *Showalter v. Western R.R. Co.* (1940) 16 Cal.2d 460, 468.) "Whether an out-of-court statement meets the statutory requirements for admission as a spontaneous statement is generally a question of fact for the trial court, the determination of which involves an exercise of the court's discretion. [Citation.] We will uphold the trial court's determination of facts when they are supported by substantial evidence and review for abuse of discretion its decision to admit evidence under the spontaneous statement exception. [Citations.]" (*People v. Merriman* (2014) 60 Cal.4th 1, 65.)

Here, the record supports the trial court's finding that Ruiz's statements to Officer Vasquez were spontaneous. Rosales was shot between 2:28 p.m. -- the last time his cell phone was used -- and 2:40 p.m. -- the time Officer Vasquez arrived at Rosales's house. Officer Vasquez spoke with Ruiz shortly after arriving at the house. Ruiz appeared to be in shock, his eyes were wide open, and he was pacing back and forth. When speaking with the officer, Ruiz spoke very rapidly in broken sentences and with a high-pitched voice. The record thus supports the trial court's determination that Ruiz was still under the influence of startling events when he made his statements to the officer. (See *Poggi*, *supra*, 45 Cal.3d at pp. 319-320 [declarant's statements spontaneous although she made them 30 minutes after attack, after she had become calm enough to speak coherently, and in response to officer's questions].)

Appellants contend Ruiz's statements went beyond describing the shooting and murder, noting that Ruiz provided an explanation of what caused Rosales to call Ruiz and ask him for a ride. Evidence Code section 1240 permits statements explaining an event. Ruiz's statement that Rosales wanted a ride in order to meet Estrada at a laundromat explained why Ruiz was at the scene of the shooting and why he saw Estrada there. In short, the trial court did not abuse its discretion in admitting Ruiz's statements to Officer Vasquez under Evidence Code section 1240.

Appellants further argue that admission of Ruiz's statements violated their confrontational rights because the statements were testimonial. In *Davis v. Washington* (2006) 547 U.S. 813, the United States Supreme Court explained that "[s]tatements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." (*Id.* at p. 822)

In *People v. Chism* (2014) 58 Cal.4th 1266, the California Supreme Court applied this reasoning to determine that an unavailable percipient witness's statements to an officer about a shooting were nontestimonial. In reaching this conclusion, the court noted: "Officer Romero was the first officer to arrive at the scene, and Miller was the first person he contacted. Miller appeared to be 'very nervous' and 'shaken up.' The circumstances of the encounter, which took place outside a store where a shooting had recently occurred, reveal that Miller and Officer Romero spoke to each other in order to deal with an ongoing emergency. It was objectively reasonable for Officer Romero to believe the suspects, one of

16

whom presumably was still armed with a gun, remained at large and posed an immediate threat to officers responding to the shooting and to the public.  We are convinced that Miller's additional statements concerning his observations and descriptions of the suspects were made for the primary purpose of meeting an ongoing emergency and not to produce evidence for use at a later trial."  (*Id*. at p. 1289.)  Here, as the trial court found, Officer Vasquez questioned Ruiz -- a witness who was still demonstrably shaken and distraught from observing a shooting at close range minutes before -- to deal with an ongoing emergency -- locating and apprehending an at-large shooter.  Although Officer Vasquez was not the first officer to arrive at the scene and he spoke with other officers who identified Ruiz as a possible witness, those facts are not dispositive.  The record indicates Officer Vasquez was the first officer to speak with Ruiz about the shooting incident.  We conclude that Ruiz's statements were nontestimonial.

B.     *The Trial Court did not Err in Admitting Kalac's Testimony Over Hearsay Objections.*

The trial court permitted Kalac to testify that Estrada stated "she had someone that they could come up on" under the adoptive admissions exception to the hearsay rule.  In support of its evidentiary ruling, the court stated that any "law-abiding citizen standing there when there's a conversation going on about come up or robbery [or] however you want to phrase it, would leave.  [Or say:]  'I'm not participating in that.  I'm gone.'"  Appellants Gonzalez and Garcia contend the court erred in admitting Estrada's statement, as there was no evidence that they heard or understood "come up on" to mean "rob."  We find no abuse of discretion.

Evidence Code section 1221 provides:  "Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if the statement is one of which the party, with knowledge of the content thereof, has by words or other

17

conduct manifested his adoption or his belief in its truth." "In determining whether a statement is admissible as an adoptive admission, a trial court must first decide whether there is evidence sufficient to sustain a finding that: (a) the defendant heard and understood the statement under circumstances that normally would call for a response; and (b) by words or conduct, the defendant adopted the statement as true." (*People v. Davis* (2005) 36 Cal.4th 510, 535.) "For the adoptive admission exception to the hearsay rule to apply, . . . it is enough that the evidence showed that the defendant participated in a private conversation in which the crime was discussed and the circumstances offered him the opportunity to deny responsibility or otherwise dissociate himself from the crime, but that he did not do so." (*Id*. at p. 539.) Here, Kalac was cross-examined on the meaning of the term "come up on," and he maintained that it was slang for "rob." The trial court was entitled to credit Kalac's testimony and conclude that Gonzalez and Garcia understood the term and adopted Estrada's plan to rob Rosales. Moreover, were we to find error in admitting that portion of Kalac's testimony, we would deem it harmless, as Kalac testified that the principal subject of all three appellants' conversation was robbing Rosales. Thus, it is not probable that Gonzalez and Garcia would have achieved a more favorable result had Estrada's use of the term "come up on" been excluded. (See *People v. Seumanu* (2015) 61 Cal.4th 1293, 1308 [erroneous admission of hearsay statement reviewed for error under *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*)].)

C. *Appellants Fail to Demonstrate the Trial Court Prejudicially Erred in Instructing the Jury on Kalac and on Corroboration of his Testimony.*

The trial court instructed the jury to determine whether Kalac was an accomplice, and further instructed that if the jury found Kalac was an accomplice, it could credit his testimony concerning the robbery only if such testimony was supported by independent corroborating evidence. Appellants contend the court

18

erred in not instructing the jury that Kalac was an accomplice as a matter of law. They further contend there was insufficient evidence to corroborate Kalac's testimony. Alternatively, appellants contend that the jury instructions on accomplice testimony were incomplete or inaccurate, as (1) the instructions failed to advise the jury that the statements of one accomplice may not be used to corroborate another accomplice's testimony, and (2) that the instructions permitted the jury to use Kalac's out-of-court statements to corroborate his trial testimony.

1. *The Trial Court did not Err in Failing to Instruct the Jury that Kalac was an Accomplice as a Matter of Law.*

Under section 1111, "[a] conviction can not be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof." "If sufficient evidence is presented at trial to justify the conclusion that a witness is an accomplice, the trial court must so instruct the jury, even in the absence of a request." (*People v. Brown* (2003) 31 Cal.4th 518, 555.) Under section 1111, "[a]n accomplice is . . . defined as one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given." "This definition encompasses all principals to the crime [citation], including aiders and abettors and coconspirators. [Citation.]" (*People v. Stankewitz* (1990) 51 Cal.3d 72, 90 (*Stankewitz*).) "Whether someone is an accomplice is ordinarily a question of fact for the jury; only if there is no reasonable dispute as to the facts or the inferences to be drawn from the facts may a trial court instruct a jury that a witness is an accomplice as a matter of law." (*People v. Valdez* (2012) 55 Cal.4th 82, 145-146 (*Valdez*).)

Appellants contend that based on Kalac's own testimony, he was an aider and abettor to Rosales's murder, as Kalac understood that appellants were planning to rob Rosales of drugs and gave Estrada money to rent another hotel room. Aider and abettor liability requires proof that the aider and abettor intended to assist the direct perpetrators in achieving their unlawful ends. (*Valdez*, *supra*, 55 Cal.4th at pp. 146-147.) Although "'an act [that] has the effect of giving aid and encouragement, and . . . is done with knowledge of the criminal purpose of the person aided, *may* indicate that the actor intended to assist in fulfillment of the

20

known criminal purpose,'" "'the act may be done with some other purpose [that] precludes criminal liability.'" (*Id*. at p. 147, quoting *People v. Beeman* (1984) 35 Cal.3d 547, 559.) Thus, where there is no direct evidence that a witness acted with the requisite knowledge and intent, the witness is not an accomplice as a matter of law. (See, e.g., *Valdez*, *supra*, at pp. 146-147 [witness not accomplice as matter of law despite evidence that he drove perpetrators to crime location after being told by perpetrators that they had to go there "'to take care of something,'" which witness understood to mean assault or kill someone].)

Here, Kalac denied any intent to assist or facilitate the robbery. He also testified he gave Estrada his money unwillingly, and asserted that he was present in the hotel room only because Garcia told him they were going to a birthday party. Thus, although the evidence may have permitted a finding that Kalac was an accomplice, it did not compel that finding as a matter of law. (See, e.g., *People v. Carrasco* (2014) 59 Cal.4th 924, 969 [witness not accomplice as matter of law although he accompanied defendant to crime scene and helped defendant escape after murder, where witness denied knowledge of and intent to assist defendant in committing robbery and claimed defendant forced him to assist in escape]; *People v. Williams* (2008) 43 Cal.4th 584, 637 [witness not accomplice as matter of law where he denied having the intent to further defendant's criminal purpose and claimed to be present with defendant for another reason]; see also *Stankewitz*, *supra*, 51 Cal.3d at p. 90 [presence at the scene of a crime or failure to prevent its commission insufficient to establish aiding and abetting].) The fact that Kalac asserted his Fifth Amendment right to remain silent and was granted use immunity is not dispositive. (See, e.g., *Stankewitz*, *supra,* at p. 90 ["The fact that a witness has been charged or held to answer for the same crimes as the defendant and then has been granted immunity does not necessarily establish that he or she is an

21

accomplice."].)  In short, whether Kalac was an accomplice was properly left for the jury to determine.

2.     *Kalac's Testimony was Sufficiently Corroborated.*

Appellants' contention that Kalac's testimony was not sufficiently corroborated derives from their contention he was an accomplice as a matter of law.  But where the jurors reasonably could have found that a witness was not an accomplice, "we need not . . . decide whether there was sufficient corroborating evidence as to each defendant." (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 432, italics omitted; see also *People v. Santo* (1954) 43 Cal.2d 319, 326-327 ["Since it could be inferred that [the witness] was not an accomplice, the question whether he was, was properly left to the jury, and as a reviewing court, we are bound to presume in favor of affirming the judgment that the jury found that he was not an accomplice."].)  Nevertheless, we agree with the trial court that Kalac's testimony was sufficiently corroborated.[12]  (See *People v. Williams, supra,* 43 Cal.4th at pp. 636-637 [even if trial court erred in refraining from instructing jury that witness was accomplice as a matter of law, error was harmless because there was sufficient corroborating evidence"].)  "'Corroborating evidence may be slight [and] may be entirely circumstantial' [citation], and although that evidence must implicate the defendant in the crime and relate to proof of an element of the crime, it need not be sufficient to establish all the elements of the crime. [Citation.]" (*Id.* at p. 638, quoting *People v. Hayes* (1999) 21 Cal.4th 1211, 1271.)  Here, forensic evidence and testimony by other witnesses sufficiently corroborated key aspects of Kalac's testimony and connected appellants to the crime of robbery.

---

[12]     We attach no significance to the posttrial remarks of the trial court that it believed Kalac was an accomplice, particularly in light of the fact that the court instructed the jury, without defense objection, to determine whether Kalac was an accomplice.

22

Kalac's testimony that appellants decided to rob Rosales because they had no drugs or money was corroborated by the fact that Gonzalez only had 25 cents on his person when he was arrested later that day. Ruiz stated that Rosales was expecting to meet Estrada at the laundromat. When Estrada appeared, however, she was accompanied by two Hispanic males, suggesting that the perpetrators intended to rob Rosales. Had they intended to purchase drugs, only Estrada's presence would have been necessary. Ruiz also stated that after Rosales was killed, the shooter tried to pull Ruiz out of the car, suggesting that the perpetrators wanted to steal any drugs Rosales had brought with him.

Moreover, Kalac's testimony was sufficiently corroborated as to each appellant. Estrada was connected to the crime by Ruiz's statements that she was to blame for Rosales's death. Ruiz identified Estrada as the person who pointed at Rosales before he was shot. In a recorded statement, Estrada admitted using Jennifer's cell phone to call Rosales before he died. (See *People v. Gurule* (2002) 28 Cal.4th 557, 628 [accomplice's testimony may be corroborated by defendant's own statements].) She used a cell phone other than her own, but attempted to hide that fact from Rosales. In addition, Estrada moved from the Crystal Inn to the American Inn just before the murder, suggesting she was looking for a place of safety or a hideout following the robbery. (See *People v. Perry* (1972) 7 Cal.3d 756, 772 ["[A]ttempts of an accused to conceal . . . his whereabouts . . . may warrant an inference of consciousness of guilt and may corroborate an accomplice's testimony."] overruled on other grounds in *People v. Green* (1980) 27 Cal.3d 1, 28.) Finally, she was arrested with Gonzalez outside her house, hours after Rosales's death.

As to Gonzalez, he admitted being the shooter. The fact that he had no money on him when he was arrested suggests that robbery, not a drug purchase, was the goal.

Garcia was connected to the crime by (1) the use of his cellular phone to contact Rosales, (2) video surveillance showing a second male following Gonzalez out of the hotel to the laundromat, and (3) Ruiz's statements that there were two Hispanic males with Estrada. (See *People v. Chism*, *supra*, 58 Cal.4th at p. 1301 [accomplice's testimony partly corroborated where video surveillance showed two African-Americans entering and leaving store at time of robbery and defendant was African-American].) Moreover, when Garcia was arrested, he fled, suggesting a consciousness of guilt. "Flight tends to connect an accused with the commission of an offense and may indicate that an accomplice's testimony is truthful." (*People v. Perry*, *supra*, 7 Cal.3d at p. 771.) In short, Kalac's testimony was sufficiently corroborated.[13]

   3.   *The Jury Instruction on the Evidence Required to Corroborate an Accomplice's Testimony was not Erroneous.*

   Appellants' claim that the jury was improperly instructed on the kind of evidence that could be considered as corroborating evidence is forfeited, as they failed to timely object to the instructions. More important, as the jury reasonably could find Kalac was not an accomplice, no corroborating evidence was necessary, and thus any instructional error was not prejudicial. (*People v. Bryant*, *Smith and Wheeler*, *supra,* 60 Cal.4th at p. 432.) Even were we to consider appellants' claim, we would find no prejudicial error. First, it is not reasonably likely that the jury would have used Estrada's statement (that she had someone that they could "come

---

[13]   As Kalac's testimony was corroborated, we reject appellants' claim that the trial court erred in denying their motions for acquittal under section 1118.1. We also reject their claim that there was insufficient evidence to support the jury's factual determination that appellants committed or attempted to commit a robbery. Whether there was sufficient evidence to support the jury's true findings on the robbery special circumstance allegation for sentencing under section 190.2, subdivision (d) is addressed in Part F, *infra*.

24

up on") and Garcia's statement ("Shit went bad") -- set forth in Kalac's trial testimony -- to corroborate Kalac's other testimony. The accomplice instruction, as given, clearly stated that the corroborating evidence must be "independent of the accomplice's testimony." Second, it is unlikely the jury believed it could use Kalac's out-of-court statements (to San Angelo) to corroborate his trial testimony, as the accomplice instruction does not distinguish between an accomplice's out-of-court statements and his in-court statements. (See *People v. Andrews* (1989) 49 Cal.3d 200, 214 [trial court had no sua sponte duty to modify accomplice instructions to provide that accomplice corroboration rule applied to out-of-court statements, as "gist of those instructions was that accomplices were to be distrusted, and that their testimony could not furnish the sole basis for a conviction"].)

D.   *Any Instructional Error in Failing to Instruct on Malice Murder, Lesser Included Offenses of Murder and Defenses to Murder was not Prejudicial.*

The jury was instructed on first degree felony murder and first degree felony murder as an aider and abettor. Aside from felony murder, the jury was not instructed on any other theory of murder. Appellants contend the trial court erred when it failed to instruct, sua sponte, on malice murder and its lesser included offenses, as well as the true defenses of accident and self-defense.

"'The trial court is obligated to instruct the jury on all general principles of law relevant to the issues raised by the evidence, whether or not the defendant makes a formal request.' [Citations.] 'That obligation encompasses instructions on lesser included offenses if there is evidence that, if accepted by the trier of fact, would absolve the defendant of guilt of the greater offense but not of the lesser.' [Citations.]" (*People v. Rogers* (2006) 39 Cal.4th 826, 866.) "The testimony of a single witness, including the defendant, can constitute substantial evidence

25

requiring the court to instruct on its own initiative." (*People v. Lewis* (2001) 25 Cal.4th 610, 646.)

As the California Supreme Court has explained, the duty to instruct on lesser included offenses "does not require or depend on an examination of the evidence adduced at trial. The trial court need only examine the accusatory pleading. When the prosecution chooses to allege multiple ways of committing a greater offense in the accusatory pleading, the defendant may be convicted of the greater offense on any theory alleged [citation], including a theory that necessarily subsumes a lesser offense. The prosecution may, of course, choose to file an accusatory pleading that does not allege the commission of a greater offense in a way that necessarily subsumes a lesser offense. But so long as the prosecution has chosen to allege a way of committing the greater offense that necessarily subsumes a lesser offense, and so long as there is substantial evidence that the defendant committed the lesser offense without also committing the greater, the trial court must instruct on the lesser included offense. This allows the jury to consider the full range of possible verdicts supported by the evidence and thereby calibrate a defendant's culpability to the facts proven beyond a reasonable doubt." (*People v. Smith* (2013) 57 Cal.4th 232, 244.)

Here, the prosecution chose not to amend the information to allege solely felony murder; thus, appellants remained charged with malice murder under section 187. Although the failure to specifically allege felony murder in the information did not foreclose the prosecutor from pursuing that theory at trial (see *People v. Morgan* (2007) 42 Cal.4th 593, 616), under the accusatory pleadings test, appellants were entitled to instructions on malice murder and the lesser included offenses to murder, if warranted by substantial evidence. Appellants contend that Ruiz's statements to Officer Vasquez were sufficient to support an instruction on first degree premeditated and deliberate murder, that Kalac's testimony supported

an instruction on the lesser included offense of involuntary manslaughter, and that Gonzalez's testimony was sufficient to support instructions on the lesser included offenses of second degree murder, voluntary manslaughter based on imperfect self-defense and voluntary manslaughter based on provocation, as well as instructions on the defenses of self-defense and accident. We need not address these contentions, as we conclude any error was harmless. (See *People v. Breverman* (1998) 19 Cal.4th 142, 178 [in a noncapital case, error in failing sua sponte to instruct on lesser offenses is reviewed for prejudice exclusively under *Watson*]; see also *People v. Earp* (1999) 20 Cal.4th 826, 886 (*Earp*) [reviewing court need not decide whether substantial evidence supported instructions on lesser included offenses of second degree murder and involuntary manslaughter where any instructional error would necessarily be harmless].)

It is not reasonably probable that appellants would have obtained a more favorable outcome had the jury been instructed on malice murder, its lesser included offenses and the defenses of accident and self-defense. The jury found beyond a reasonable doubt that appellants were guilty of first degree murder for a death that occurred during the perpetration or attempted perpetration of a robbery. Accordingly, the failure to instruct on first degree murder was not prejudicial, as that instruction would merely have provided the jury with another theory on which to convict appellants of first degree murder. Nor was the failure to instruct on accident and self-defense prejudicial, as neither accident nor self-defense is a defense to felony murder. (See *People v. Cavitt* (2004) 33 Cal.4th 187, 197 ["The purpose of the felony-murder rule is to deter those who commit the enumerated felonies from killing by holding them strictly responsible for any killing committed by a cofelon, whether intentional, negligent, or accidental, during the perpetration or attempted perpetration of the felony"]; *In re Christian S*. (1994) 7 Cal.4th 768, 773, fn. 1 ["[O]rdinary self-defense doctrine -- applicable when a defendant

27

*reasonably* believes that his safety is endangered -- may not be invoked by a defendant who, through his own wrongful conduct (e.g., the initiation of a physical assault or the *commission of a felony*), has created circumstances under which his adversary's attack or pursuit is justified"] second italics added; cf. *People v. Loustaunau* (1986) 181 Cal.App.3d 163, 170 ["When a burglar kills in the commission of a burglary, he cannot claim self-defense, for this would be fundamentally inconsistent with the very purpose of the felony-murder rule."].)

Additionally, the jury's return of guilty verdicts on felony murder charges and true findings on the robbery special circumstance allegations necessarily resolved factual issues related to lesser included offenses of malice murder against appellants. In determining whether appellants were guilty of murder under the felony-murder theory, the jury was required to determine first whether appellants committed or attempted to commit robbery, and only thereafter whether a death occurred during the commission of the robbery or attempted robbery. Thus, it is not reasonably probable that appellants would have obtained a more favorable outcome had the jury been instructed on the lesser included offenses of murder. (See, e.g., *People v. Elliot* (2005) 37 Cal.4th 453, 476 (*Elliot*) [trial court's failure to instruct on second-degree murder harmless beyond a reasonable doubt because "the true finding as to the attempted-robbery-murder special circumstance establishes here that the jury would have convicted defendant of first degree murder under a felony-murder theory, at a minimum, regardless of whether more extensive instructions were given on second degree murder"]; *People v. Koontz* (2002) 27 Cal.4th 1041, 1086-1087 (*Koontz*) [any error in failing to instruct the jury on the definition of manslaughter and the doctrine of unreasonable self-defense harmless, as jury necessarily rejected the unreasonable self-defense theory in returning a true finding on the robbery special-circumstance allegation]; *Earp*, *supra*, 20 Cal.4th at p. 886 [any error to instruct on second degree murder and

28

involuntary manslaughter harmless where jury expressly found the existence of two special circumstance allegations. "Given these findings, the jury necessarily determined that the killing of [the victim] was first degree felony murder perpetrated in the commission of rape and lewd conduct and not any lesser form of homicide"]; accord, *People v. Castaneda* (2011) 51 Cal.4th 1292, 1328; *People v. Horning* (2004) 34 Cal.4th 871, 906.)

To the extent *Campbell*, *supra*, 233 Cal.App.4th 148, suggests that the jury's guilty verdicts on felony murder and its true findings on a robbery special circumstance allegation do not render the failure to instruct on lesser included offenses of malice murder harmless under *Watson*, we respectfully disagree. The appellate court in *Campbell* distinguished *Earp*, *Koontz*, and *Elliott* on the ground that in those cases, the jury was instructed on both felony murder and premeditated and deliberate murder. (See *Campbell*, at p. 167.) As noted, however, an instruction on premeditated and deliberate murder would have done no more than allow the jury to convict appellants under another theory of first degree murder. Accordingly, any instructional error here was harmless.

E.     *There was no Cumulative Error.*

Appellants contend that even if harmless individually, the cumulative effect of the claimed trial errors mandates reversal of their convictions. Because we have rejected appellants' other claims, their claim of cumulative error fails. (See *People v. Sapp* (2003) 31 Cal.4th 240, 316; *People v. Seaton* (2001) 26 Cal.4th 598, 692.)

F.     *The Jury's Findings on the Robbery Special Circumstance Allegation were Supported by Sufficient Evidence.*

The jury was instructed that in order to return true findings on the robbery special circumstance allegation for a defendant who was not the actual killer, the prosecution was required to prove: (1) that the defendant's participation in the crime began before or during the killing; (2) that the defendant was a major

29

participant in the crime; and (3) that when the defendant participated in the crime, he or she acted with reckless indifference to human life. The jury returned true findings on the special circumstance as to all appellants. Appellants Estrada and Garcia contend there was insufficient evidence to support the jury's true findings, arguing that they were not major participants in the attempted robbery of Rosales. In determining this issue, we draw guidance from *Banks*, *supra*, 61 Cal.4th 788.[14] *Banks* involved a defendant, Matthews, who was found guilty of first degree murder under a felony-murder theory, based on evidence that he was the getaway driver following an armed robbery. (*Id*. at p. 794.) As Matthews was not the actual killer, the court addressed whether he was liable for life imprisonment without the possibility of parole under section 190.2, subdivision (d). The section provides: "[E]very person, not the actual killer, who, with reckless indifference to human life and as a major participant, aids, abets, counsels, commands, induces, solicits, requests, or assists in the commission of a felony enumerated in paragraph (17) of subdivision (a) which results in the death of some person or persons, and who is found guilty of murder in the first degree therefor, shall be punished by death or imprisonment in the state prison for life without the possibility of parole if a special circumstance enumerated in paragraph (17) of subdivision (a) has been found to be true under Section 190.4." (§ 190.2, subd. (d).)

After stating that "Matthews's culpability for first degree felony murder is not in dispute" (*Banks*, *supra*, 61 Cal.4th at p. 794), the court set forth nonexclusive factors for a jury to consider in determining whether an accomplice is a "major participant" as that term is used in section 190.2, subdivision (d). These factors include: "What role did the defendant have in planning the criminal

---

[14]     *Banks* was published after appellants filed their opening briefs, and its holding was first addressed in appellants' reply brief. We requested and received supplemental letter briefs on the applicability of *Banks* to the facts of this case.

enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death? What did the defendant do after lethal force was used?" (*Banks*, at p. 803, fn. omitted.) The court reiterated that "[n]o one of these considerations is necessary, nor is any one of them necessarily sufficient." (*Ibid.*)

Applying those factors to the case, the court found that while there was substantial evidence Matthews acted as the getaway driver, "[n]o evidence was introduced establishing Matthews's role, if any, in planning the robbery. No evidence was introduced establishing Matthews's role, if any, in procuring weapons." (*Banks*, *supra*, 61 Cal.4th at p. 805, fn. omitted.) "During the robbery and murder, Matthews was absent from the scene, sitting in a car and waiting. There was no evidence he saw or heard the shooting, that he could have seen or heard the shooting, or that he had any immediate role in instigating it or could have prevented it." (*Ibid.*) The court concluded that on this record, "Matthews was, in short, no more than a getaway driver" and "cannot qualify as a major participant under section 190.2(d)." (*Id.* at pp. 805 & 807.)

Here, there was substantial evidence that Estrada and Garcia were major participants in the robbery. (See *Banks*, *supra*, 61 Cal.4th at p. 804 [in reviewing sufficiency of evidence supporting special circumstance allegation, appellate court considers the record in light most favorable to the judgment].)[15] Estrada was

---

[15] As Gonzalez was the actual killer, he is not entitled to the analysis set forth in *Banks*. Instead, under section 190.2, subdivision (b), he is statutorily eligible for

identified as the person who first proposed robbing Rosales. She set up the robbery by calling Rosales and asking him to meet her at the laundromat. Estrada also was identified at being at the scene, and pointing Rosales out to the shooter. After the shooting occurred, she did not call 911 to assist the victim, or call the police to report a killing. Rather, she spent the afternoon with the shooter, Gonzalez, until they were arrested later that evening. On this record, there was sufficient evidence for the jury to find that Estrada was a major participant under section 190.2, subdivision (d).

Garcia was present when Estrada proposed robbing Rosales. There was evidence he participated in the planning of the robbery with Estrada and Gonzalez and offered to assist as a lookout. His phone showed calls to Rosales shortly before the murder. Garcia was present at the scene, "in a position to facilitate or prevent the actual murder." (*Banks*, *supra*, 61 Cal.4th at p. 803.) He made no attempt to prevent the shooting or to notify authorities after the killing. Instead, he walked away from the scene with Gonzalez. The evidence was sufficient to support the jury's finding that Garcia was a major participant under section 190.2, subdivision (d).

G.    *The Imposition of a Parole Revocation Fine was Erroneous.*

As to each appellant, the abstract of judgment reflects the imposition of a $300 parole revocation fine. However, in its oral pronouncement of judgment, the trial court did not impose a parole revocation fine. Moreover, as appellants were sentenced to life imprisonment without the possibility of parole, parole revocation

---

life imprisonment without the possibility of parole. (See § 190.2, subd. (b) ["[A]n actual killer, as to whom the special circumstance has been found to be true under Section 190.4, need not have had any intent to kill at the time of the commission of the offense which is the basis of the special circumstance in order to suffer death or confinement in the state prison for life without the possibility of parole."].)

fines are inapplicable.  (*People v. Jenkins* (2006) 140 Cal.App.4th 805, 819.)  We will modify the abstracts of judgment to conform to the trial court's oral sentencing decision.  (*People v. Mitchell* (2001) 26 Cal.4th 181, 185-186.)

## DISPOSITION

The abstracts of judgment are modified to delete the $300 parole revocation fines.  The clerk of the superior court is directed to prepare amended abstracts of judgment reflecting these changes and to forward certified copies to the Department of Corrections and Rehabilitation.  In all other respects, the judgments are affirmed.

**CERTIFIED FOR PUBLICATION.**


MANELLA, J.


We concur:


EPSTEIN, P. J.                                    WILLHITE, J.


33