Filed 10/15/20; Opinion following transfer from Supreme Court

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

|  |  |
|---|---|
| In re DONALD WILLIAM MCDOWELL<br><br><br>on Habeas Corpus. | A157020<br><br>(Sonoma County<br>Super. Ct. No. SCR33484) |

Donald McDowell and Tyson Hutchison planned and executed a burglary and an attempted armed robbery of a drug dealer. Hutchison shot and killed the drug dealer. Although he was not the actual killer, McDowell was sentenced to life imprisonment without the possibility of parole after a jury convicted him of, among other things, first degree murder (Pen. Code, § 187, subd. (a))[1] and found true robbery-murder and burglary-murder special circumstances (§ 190.2, subds. (a)(17)(A), (G)).

After our high court decided *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*) and *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*), McDowell filed a petition for writ of habeas corpus, challenging the special circumstance findings. We denied relief in a published opinion (*In re McDowell* (2020) 45 Cal.App.5th 921, review granted May 13,

---

[1] Undesignated statutory references are to the Penal Code.

2020, S261450, judg. vacated and cause remanded Sept. 9, 2020). The Supreme Court granted review and eventually transferred the matter back to us with directions to vacate our opinion and reconsider the case in light of *In re Scoggins* (2020) 9 Cal.5th 667 (*Scoggins*). Accordingly, we have vacated our prior opinion, reviewed McDowell's and the Attorney General's supplemental briefs, and now conclude, as we did previously, that the special circumstance findings are adequately supported.

## BACKGROUND

### A.

Under the first degree felony-murder rule, a defendant who commits (or attempts to commit) robbery or burglary may be convicted of murder for a killing committed during the felony. (Former § 189, amended by Stats. 1999, ch. 694, § 1; *People v. Chun* (2009) 45 Cal.4th 1172, 1182.) However, a defendant like McDowell, who aided and abetted the underlying felony but was not the actual killer, may only be subject to life imprisonment without parole if the prosecution proves the existence of special circumstances: either defendant intended to kill (§ 190.2, subd. (c)) or aided and abetted the commission of a specified felony "with reckless indifference to human life and as a major participant." (*Id.*, subds. (a)(17), (d); see *In re Ramirez* (2019) 32 Cal.App.5th 384, 393.)

The "reckless indifference" and "major participant" requirements of section 190.2, subdivision (d), codify the limits announced in *Tison v. Arizona* (1987) 481 U.S. 137 (*Tison*). (*People v. Estrada* (1995) 11 Cal.4th 568, 575.) *Tison* held the Eighth Amendment does not prohibit imposition of the death penalty on a defendant convicted of first degree

2

felony murder so long as the defendant was a "major participant" in the underlying felony and acted with "reckless indifference to human life." (*Tison, supra,* 481 U.S. at p. 158 & fn. 12.) Although these standards were developed in death penalty cases, they apply equally to cases involving life imprisonment without the possibility of parole under section 190.2, subdivision (d). (*Banks, supra,* 61 Cal.4th at p. 804.)

**B.**[2]

The victim in this case, James Meehan, was a methamphetamine dealer. On June 9, 2002, at about 3:00 a.m., Meehan was at his Santa Rosa residence with James L. and Micki A.

Micki responded to a knock on the door, and McDowell entered the house. McDowell was armed with a "palm knife" — a knife designed to be held in the palm of a hand, with the blade protruding between the index and middle fingers. Hutchison entered the house shortly after McDowell. Hutchison carried a small black revolver, which he pointed at Meehan, Micki, and James, while standing behind McDowell.

One of the two men said, "Give me your stuff." McDowell looked straight ahead at Meehan and said, "Where's the shit?" When Meehan said, "I don't have none" or " '[t]here's nothing here,' " Hutchison fired a warning shot into the floor next to Meehan. In response, James said,

---

[2] The facts are primarily taken from this court's unpublished opinion in McDowell's direct appeal. (*People v. McDowell* (June 2, 2009, A119754) [nonpub. opinion.].) We deny as unnecessary the Attorney General's request for judicial notice of the appellate record. (See *In re Reno* (2012) 55 Cal.4th 428, 484 ["Petitioners need not separately or specifically request judicial notice of all documents connected with their past appeals"].)

" '[p]lease don't hurt him.' " Meehan said, "kill me if you're going to kill me." Micki grabbed a hard, plastic case containing a drill and struck McDowell in the chest with it, knocking McDowell down. Meehan tried to grab the gun from Hutchison. Hutchison then fired two shots at Meehan, who, grabbing his chest and bleeding from the mouth, stumbled into his bedroom and collapsed. McDowell and Hutchison fled. Micki called 911 and attempted first aid. Meehan died as a result of two gunshot wounds to his torso.

Meehan was shot only "a few seconds" or a brief "pause" after Hutchison's first shot into the floor. The whole incident took "[m]aybe like a minute."

Pamela S. testified that on the weekend of the murder, she allowed McDowell and Hutchison to house-sit. Before she left, she told Hutchison she kept a .22-caliber revolver in her bedroom nightstand. A firearms examiner identified the revolver as the murder weapon.

Harry S., who lived near McDowell at the time of the crime, testified that two days after the murder, McDowell said he and Hutchison had gone to the victim's home to "rip off a dealer" and "tak[e] [his] stuff." McDowell also said that a girl had hit him with a briefcase, he had not known that Hutchison had a gun, and he was "stunned" when Hutchison shot the victim.

K.F. recalled a conversation, before the murder, between McDowell and Joe Kampmann. Kampmann said "some guy" in Santa Rosa owed him money and that "if he didn't have money, then [he] had drugs." Kampmann added, "If he didn't want to pay up, . . . he would be easy to take." After the murder, Kampmann shared with K.F. a newspaper article about a homicide in Santa Rosa. K.F. discussed the

4

article with McDowell, who told her that Hutchison shot the victim and that someone had hit him over the head.

Charles P., who briefly lived with McDowell, recalled hearing a conversation, before the murder, in which Kampmann, McDowell, and others, talked about a man who had "a lot of money and drugs in [a] safe." Charles believed Kampmann was "angry" because the man had "burned" him in what Charles inferred was "a dope deal gone bad." McDowell asked Kampmann where the man lived. After the murder, McDowell tearfully told Charles that he had not intended to kill anyone and that he did not know Hutchison had a gun. McDowell stated he had only intended to "collect some money and dope" and to "[b]ully the guy."

A couple of days before the murder, McDowell's former neighbor, Sandy B., gave him a ride to Santa Rosa. They drove around a residential neighborhood trying to find Meehan's house, and, when they had trouble finding it, McDowell made a phone call. At some point, McDowell left the car for about 15 minutes. Later, after the murder, McDowell showed Sandy a newspaper article regarding a homicide. McDowell was upset and told Sandy that Hutchison had killed someone when the two men had "gone back to the house."

## C.

A jury convicted McDowell of first degree murder (§ 187, subd. (a), count one), attempted robbery (§§ 664, 211, count two), and burglary (§ 459, count three). The jury found both the burglary-murder and robbery-murder special circumstance allegations (§ 190.2, subd. (a)(17)(A), (G)) true. The jury also found true allegations that a principal was armed during the commission of these offenses (§ 12022,

5

subd. (a)(1)) and that McDowell personally used a deadly or dangerous weapon, a knife (§ 12022, subd. (b)(1)), in the commission of attempted robbery. McDowell was sentenced to a term of life imprisonment without the possibility of parole for the murder and a consecutive sentence of six years for his use of a deadly weapon and for a prior serious felony conviction (§§ 667, subd. (a)(1), 1170.12).

## D.

McDowell filed a direct appeal. However, McDowell did not separately challenge the sufficiency of the evidence to support the special circumstance findings. This court affirmed the judgment in its entirety in an unpublished opinion, *People v. McDowell* (June 2, 2009, A119754) [nonpub. opinion].

Approximately six years later, our Supreme Court decided, in *Banks, supra*, 61 Cal.4th 788, "under what circumstances an accomplice who lacks the intent to kill may qualify as a major participant so as to be statutorily eligible for the death penalty" under section 190.2, subdivisions (a)(17) and (d). (*Banks* at p. 794.) *Banks* articulated a number of factors relevant to that determination. (*Id.* at p. 803.) The following year, our Supreme Court announced related considerations relevant to determining whether a defendant acted with "reckless indifference to human life." (*Clark, supra*, 63 Cal.4th at pp. 609-623.)

More than two years later, McDowell filed a petition for a writ of habeas corpus in the superior court, arguing that, under *Banks*, the evidence against him was insufficient to support the special circumstance findings. After the superior court denied the petition, McDowell, acting pro se, petitioned for habeas corpus relief in this

6

court. We ordered the Secretary of the Department of Corrections to show cause why McDowell was not entitled to relief and appointed counsel to represent him. We limited our order to show cause to the *Banks/Clark* issue and ultimately denied the petition, concluding the special circumstance findings were adequately supported. (*In re McDowell, supra*, 45 Cal.App.5th at pp. 924, 933, review granted May 13, 2020, S261450, judg. vacated and cause remanded Sept. 9, 2020.)

## E.

The California Supreme Court granted review (May 13, 2020, S261450) and deferred further action pending consideration and disposition of a related issue in *Scoggins, supra,* 9 Cal.5th 667. After the court decided *Scoggins*, it transferred this case back to this court, directing us to vacate our decision and to reconsider the cause in light of *Scoggins*. McDowell and the Attorney General filed supplemental briefing.

## DISCUSSION

McDowell contends he is statutorily ineligible for life imprisonment without the possibility of parole because the evidence does not support the special circumstance findings. We disagree.

## A.

The Attorney General contends habeas relief is procedurally barred. A claim that could have been raised on direct appeal may generally not be raised for the first time in a petition for writ of habeas corpus. (*In re Dixon* (1953) 41 Cal.2d 756, 759.) Furthermore, "sufficiency of the evidence claims are generally not cognizable on habeas corpus." (*Scoggins, supra*, 9 Cal.5th at p. 673.) An exception to these rules applies when a new decision "clarifies the kind of conduct

7

proscribed by a statute" and shows the court has acted in excess of its jurisdiction. (*Id*. at pp. 673-674.) A defendant in McDowell's position is entitled to habeas relief " ' "if there is no material dispute as to the facts relating to his conviction and if it appears that the statute under which he was convicted did not prohibit his conduct." ' " (*Id*. at p. 674.)

Accordingly, we consider whether the record demonstrates that McDowell's conduct is proscribed by the special circumstances statute (§ 190.2, subd. (d)), as construed in *Banks*, *Clark*, and *Scoggins*. (*Scoggins, supra*, 9 Cal.5th at pp. 674, 676.) "If it is not, then the trial court acted in excess of its jurisdiction when it sentenced [McDowell] to life imprisonment without the possibility of parole, and habeas corpus relief would be available." (*Id*. at p. 674.)

Our review of the record is deferential. The question is "whether, when evidence that is reasonable, credible, and of solid value is viewed 'in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the [special circumstance] allegation beyond a reasonable doubt.' [Citations] . . . We presume, in support of the judgment, the existence of every fact the trier of fact could reasonably deduce from the evidence, whether direct or circumstantial." (*Clark, supra*, 63 Cal.4th at p. 610.)

**B.**

The *Banks* court noted that felony-murder participants may be placed on a culpability spectrum. (*Banks, supra*, 61 Cal.4th at pp. 794, 800, 802, 811.) One end of the spectrum is illustrated by *Enmund v. Florida* (1982) 458 U.S. 782: a getaway driver who was " 'not on the scene, who neither intended to kill nor was found to have had any culpable mental state,' " and who is *not* eligible for the death penalty or

8

life without parole.  (*Banks, supra,* 61 Cal.4th at p. 800, citing *Tison, supra,* 481 U.S. at p. 149.)  At the other extreme is the actual killer or an aider and abettor who intended to kill, who *is* eligible for such punishment.  (*Banks, supra,* at p. 800*,* citing *Tison* at p. 150.)  "Somewhere between them . . . lies the constitutional minimum for death eligibility."  (*Banks, supra*, at p. 802.)

To aid the determination of where to place a particular defendant on that continuum, *Banks* provided a list of nonexclusive factors: "What role did the defendant have in planning the criminal enterprise that led to one or more deaths?  What role did the defendant have in supplying or using lethal weapons?  What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants?  Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death?  What did the defendant do after lethal force was used?"  (*Banks, supra*, 61 Cal.4th at p. 803, fn. omitted.)  "No one of these considerations is necessary, nor is any one of them necessarily sufficient."  (*Ibid*.)

Applying those factors, the *Banks* court concluded there was insufficient evidence that the appealing defendant was a major participant.  (*Banks, supra*, 61 Cal.4th at pp. 805-807.)  He was not at the scene when an associate shot a guard during a botched robbery of a marijuana dispensary.  (*Id*. at p. 795.)  Instead, like the defendant in *Enmund v. Florida, supra*, 458 U.S. at p. 784, the defendant in *Banks* was "no more than a getaway driver."  (*Banks, supra,* at pp. 795-796, 804-805.)  No evidence was introduced about his role in planning the

9

robbery or in procuring weapons, and, although he and two accomplices were gang members, no evidence was presented that any of them had previously committed a violent crime.  (*Id*. at pp. 795-796, 804-805.) Having dropped his accomplices off and waited a few blocks away (*ibid.*), the defendant was not present at the scene of the shooting and thus did not have "any immediate role" in instigating it.  (*Id*. at p. 805.) The *Banks* court also overruled earlier authorities by holding that a defendant's knowledge that accomplices were armed in committing robbery is insufficient, by itself, to show he or she acted with reckless indifference to human life.  (*Id*. at pp. 807-811, 809 & fns. 8-9.)

In *Clark, supra*, 63 Cal.4th 522, the defendant was more than just a getaway driver.  He planned and orchestrated an after-hours burglary and attempted robbery of a computer store.  But he was in a car in the store's parking lot when an accomplice shot the mother of an employee who unexpectedly arrived during the attempted robbery.  (*Id*. at pp. 536-538, 612-614.)

The *Clark* court deemed it unnecessary to decide whether the defendant was a major participant because the evidence was insufficient to show the defendant had acted with reckless indifference to human life.  (*Clark, supra,* 63 Cal.4th at p. 614.)  The court noted that the two elements overlap: " 'the greater the defendant's participation in the felony murder, the more likely that he or she acted with reckless indifference to human life.' "  (*Id*. at p. 615.)  The court applied a slightly modified version of the *Banks* factors to assess mens rea, including (1) the defendant's knowledge that weapons would be used and/or his personal use of weapons; (2) the defendant's physical presence at the scene and his opportunity to restrain the killer or aid

the victim; (3) the duration of the felony; (4) the defendant's knowledge of his accomplice's propensity to kill; and (5) the defendant's efforts to minimize the risk of violence in the commission of the felony. (*Id.* at pp. 618-622.)

The *Clark* defendant did not carry a weapon. An accomplice carried a gun that was supposed to be unloaded, but, unbeknownst to the defendant, the accomplice had loaded it with a single bullet. (*Clark, supra*, 63 Cal.4th at pp. 537, 612-613, 618-619, 621-622.) The defendant was also at the far end of the parking lot at the time of the shooting, near the store's loading doors, and thus had no chance to intervene or prevent the shooting. (*Id.* at pp. 537, 619-620.) There was no evidence the defendant knew the shooter had a propensity for violence or that the defendant could predict the use of lethal force by having an opportunity to observe his accomplice's demeanor immediately before the shooting. (*Id.* at p. 621.) Finally, the robbery had been planned for after closing time, and the defendant expected his accomplice would minimize employee contact by handcuffing employees in a bathroom. (*Id.* at pp. 537, 612-613, 620-621.) The court concluded there was "nothing in the plan that . . . elevated the risk to human life beyond those risks inherent in any armed robbery." (*Id.* at p. 623.)

In *Scoggins, supra,* 9 Cal.5th 667, the defendant believed he had been swindled by the victim and sought revenge by planning an unarmed beating, to be committed by several of the defendant's friends—who would also get the defendant's money back. Once the plan was set in motion, however, one of the defendant's friends pulled out a gun and shot the victim. The defendant had not been present because he feared the victim would recognize him. Instead, the

defendant waited at a nearby gas station, where his view of the crime scene was blocked. He arrived at the scene after the shooting, checked to see if the victim was breathing, and cooperated with police. (*Scoggins, supra*, 9 Cal.5th at pp. 671-672, 678-679.)

*Scoggins* held that the special circumstance finding must be reversed because the defendant did not act with reckless indifference to human life. (*Scoggins, supra,* 9 Cal.5th at p. 671.) In reaching that conclusion, the court emphasized that determining culpability under the special circumstances statute "requires a fact-intensive, individualized inquiry" (*id.* at p. 683) and reiterated the *Clark* mens rea factors: "Did the defendant use or know that a gun would be used during the felony? How many weapons were ultimately used? Was the defendant physically present at the crime? Did he or she have the opportunity to restrain the crime or aid the victim? What was the duration of the interaction between the perpetrators of the felony and the victims? What was the defendant's knowledge of his or her confederate's propensity for violence or likelihood of using lethal force? What efforts did the defendant make to minimize the risks of violence during the felony?" (*Id.* at p. 677.)

The court explained that the *Scoggins* defendant was less culpable than the defendant in *Clark* given, in particular, the defendant's absence from the crime scene, as well as his plan, which did not involve shooting the victim or the use of any weapons. (*Scoggins, supra,* 9 Cal.5th at pp. 677-678.) Combined with the short duration of the interaction between the victim and the perpetrators (lasting a few seconds to no more than five minutes), the absence of evidence that the defendant knew his friends were likely to use lethal force, and the

12

defendant's minimization of the risk of injury—by planning an unarmed assault, during daylight, in a public place (where the presence of witnesses may discourage violence)—the evidence was insufficient to demonstrate reckless indifference to human life. (*Id.* at pp. 671, 680-681, 683.)

## C.

We are not persuaded that McDowell's "major participant" finding is unsupported. To be a major participant, "a defendant's personal involvement must be substantial, greater than the actions of an ordinary aider and abettor to an ordinary felony murder." (*Banks, supra*, 61 Cal.App.4th at p. 802.)

This case is different from McDowell's cited cases in several key respects. First, unlike the defendants in *Enmund* and *Banks,* McDowell was instrumental in planning and directly perpetrating the burglary and attempted robbery that led to Meehan's death. (*Enmund v. Florida, supra*, 458 U.S. at pp. 784, 795; *Banks, supra*, 61 Cal.4th at pp. 795-796, 804-805.) The evidence suggests McDowell helped plan the robbery after hearing Kampmann talk of being "burned" by a drug dealer who had money and drugs in a safe. In particular, McDowell asked where the dealer lived and then checked out Meehan's house before the burglary. On the day of the crimes, McDowell knocked on Meehan's door and entered first, brandishing a knife to facilitate Hutchison's entrance, and demanded, "[W]here is the shit?"

Although there is no evidence McDowell supplied the murder weapon, McDowell was himself armed with, and brandished, a deadly or dangerous weapon. Moreover, McDowell's decision to arm himself with a palm knife should be viewed in combination with the

13

particularly risky crime that he planned and led—a home invasion robbery of a methamphetamine dealer. This was not a garden-variety robbery. (See *Clark*, *supra*, 63 Cal.4th at p.617 & fn. 74.) The potential for it to turn violent was obvious.

In further contrast with the authorities McDowell relies on, McDowell was present at the scene of the shooting and had an opportunity to restrain Hutchison, or otherwise intervene on Meehan's behalf, either when he entered Meehan's house and realized they would be outnumbered or, at the very least, after Hutchison fired the warning shot. (Cf. *Banks, supra*, 61 Cal.4th at p. 795; *Clark, supra*, 63 Cal.4th at pp. 619-620; *In re Ramirez, supra,* 32 Cal.App.5th at p. 405 [defendant was not "close enough to exercise a restraining effect"]; *In re Bennett* (2018) 26 Cal.App.5th 1002, 1023, 1025 ["[defendant] was across the street in the parking lot when the shooting took place, and there was no evidence he . . . had the opportunity to stop the shooting"].) If lethal force is not part of the plan, "absence from the scene may significantly diminish culpability for death." (*Banks, supra,* 61 Cal.4th at p. 803, fn. 5.) "As a corollary, there may be significantly greater culpability for accomplices who are present." (*In re Loza* (2017) 10 Cal.App.5th 38, 50 (*Loza*); accord, *Tison, supra*, 481 U.S. at p. 158.)

McDowell attempts to minimize his opportunity to intervene by pointing out that he was knocked to the ground during the seconds that passed between the first and second shots. We agree that the opportunity was brief, but we reject McDowell's argument that he had no time to say or do something. After Hutchison fired the warning shot into the floor, there was enough time for others to take action: James implored the intruders not to hurt Meehan, Meehan said, "kill me if

14

you are going to kill me," and both Micki and Meehan physically fought back.

Considering these circumstances in total, we conclude substantial evidence supports the finding McDowell was a major participant in the felony that led to Meehan's death.

**D.**

Although McDowell presents a closer question on "reckless indifference to human life," we conclude the record also supports that finding.

**1.**

Reckless indifference requires a defendant to be " ' "*subjectively* aware that his or her participation in the felony involved a *grave risk* of death." ' " (*Banks, supra*, 61 Cal.4th at p. 807, second italics added.) "Awareness of no more than the foreseeable risk of death inherent in any armed crime is insufficient; only knowingly creating a 'grave risk of death' satisfies the constitutional minimum." (*Id.* at p. 808.) "[A]lthough the presence of some degree of defendant's subjective awareness of taking a risk is required, it is the jury's objective determination that ultimately determines recklessness. . . . [A] defendant's good faith but unreasonable belief that he or she was not posing a risk to human life in pursuing the felony does not suffice to foreclose a determination of reckless indifference to human life." (*Clark, supra,* 63 Cal.4th at p. 622.) Jurors can infer the defendant's subjective awareness from the defendants' actions. (*People v. Mora* (1995) 39 Cal.App.4th 607, 616-617.)

**2.**

Turning to the *Scoggins*/*Clark* factors, we conclude that McDowell is more culpable than the defendants in *Scoggins* and *Clark*.

First, even accepting McDowell's self-serving statements after the crime that he did not know Hutchison had a gun, it is nonetheless true that McDowell armed himself with a deadly weapon—a palm knife—and brandished it during the robbery. Indeed, if he truly did not know that Hutchison was armed, the inference is stronger that McDowell was prepared to use his knife. Furthermore, McDowell knew, by no later than the warning shot, that Hutchison was both carrying and willing to fire a gun. Thus, in contrast to *Scoggins* and *Clark*, where the defendants were unarmed, were not present at the scene, and did not know that their accomplices were either carrying a gun (*Scoggins*) or had loaded a gun that was supposed to be unloaded (*Clark*) until it was too late, the first *Scoggins/Clark* factor cuts against McDowell's position. (See *Scoggins, supra*, 9 Cal.5th at pp. 671-672, 677-679, 682-683; *Clark, supra*, 63 Cal.4th at p. 618.)

Second, McDowell's plan for the robbery posed obvious risks of lethal violence, and he made no attempt to lessen the risks. Our Supreme Court has emphasized that the planning of or participation in a felony, even one in which the perpetrators were armed, is not by itself sufficient to show reckless indifference. (*Scoggins*, *supra*, 9 Cal.5th at p. 682; *Clark, supra*, 63 Cal.4th at pp. 613-623.) Here, however, McDowell was not only armed with a knife and (at some point) knew Hutchison was armed with and willing to fire a gun, but he also chose to plan and lead a crime with a particularly high risk of violence—a home invasion robbery of a drug dealer.

We cannot agree with McDowell that he attempted to minimize the risk of violence. To the contrary, it was foreseeable that customers or others could be present, even early in the morning, and that either the dealer himself or his customers might be armed or high and thus more likely to resist. Moreover, when McDowell first entered the house, it was immediately obvious that he and Hutchison were outnumbered, increasing the chances of resistance. Yet McDowell chose to proceed. While competing inferences are possible, a reasonable jury could infer that McDowell was aware that the situation could quickly turn deadly. (See *People v. Gonzalez* (2016) 246 Cal.App.4th 1358, 1364, 1385, affd. on other grounds in *People v. Gonzalez* (2018) 5 Cal.5th 186 [defendant proposed robbing victim, lured victim to scene where she remained, informed accomplices that victim was drug dealer, who had been violent in past, and did not render aid].)

In contrast, the defendants in *Scoggins* and *Clark* planned more ordinary robberies and took steps to minimize the risk of violence. In *Scoggins*, the defendant's plan called for his multiple accomplices to rob a single victim in a public parking lot in broad daylight, using no weapons. (*Scoggins, supra*, 9 Cal.5th at pp. 671-672, 683.) In *Clark*, the defendant's plan was to rob a retail store, after business hours when few employees would be present, using a single unloaded gun. Neither plan "elevated the risk to human life beyond those risks inherent in any armed robbery." (*Clark, supra*, 63 Cal.4th at p. 623; see *Scoggins, supra*, 9 Cal.5th at pp. 682-683.)

Third, as we discussed above, McDowell was present when the violence ensued but took no steps to prevent it. In contrast to the defendants in both *Scoggins* and *Clark*, McDowell was present at the

17

scene and could observe the shooter's actions "just before the shooting that would have indicated that [the shooter] was likely to engage in lethal violence." (*Clark, supra,* 63 Cal.4th at p. 621; accord, *Scoggins, supra*, 9 Cal.5th at pp. 671-672, 678-679.) Hutchison's warning shot certainly qualifies. The standoff then grew more fraught when Meehan responded to the warning shot by saying, "kill me if you are going to kill me." In this moment, there was a brief but critical opportunity for McDowell to say or do something to deescalate the situation. Instead, he remained silent as others (James, Meehan, and Micki) verbally and physically intervened. Jurors could have reasonably concluded McDowell ignored chances to minimize the risks of lethal violence that were inherent in his plan and that materialized as he carried it out. (See *Loza, supra,* 10 Cal.App.5th at pp. 51, 53 [defendant had "time to observe and react before the murder" because he heard accomplice threaten to shoot and count to five].)

Although McDowell can be faulted for taking no steps to lessen the risk of violence, we are mindful that the events unfolded quickly after he and Hutchison entered Meehan's home. A defendant is more culpable when he does nothing to avoid violence despite having time to reflect and consider his options. Nor was there any evidence that McDowell knew Hutchison had a violent past. (See *Scoggins, supra,* 9 Cal.5th at pp. 681-682.) With respect to aiding Meehan after the shooting, McDowell's flight does not cut one way or the other given the possibility that James and Micki would summon aid, which in fact they did. (See *Clark, supra*, 63 Cal.4th at p. 620.)

Although this case may be close to the line, sufficient evidence supports the jury's conclusion McDowell acted with reckless

18

indifference to human life.  McDowell's culpability reflects the fact that he armed himself with a knife, planned and carried out a crime with obvious risks of lethal violence, and was present at the scene but took no steps to prevent the killing.  (See *Banks*, *supra*, 61 Cal.4th at p. 801 [a court "must examine the defendant's *personal* role in the crimes leading to the victim's death and weigh the defendant's individual responsibility for the loss of life"]; *People v. Murillo* (2020) 54 Cal.App.5th 160, 172 [in "cases in which a court has overturned a special circumstance finding, the defendant either was not present at the scene of the killing, or at least was not capable of preventing his cohort from acting"].)  Because the special circumstance findings are adequately supported and habeas relief is not appropriate, we need not address the Attorney General's additional arguments that the petition is procedurally barred.  (See *Loza, supra,* 10 Cal.App.5th at pp. 41-42, 55.)

## DISPOSITION

The opinion previously filed, *In re McDowell* (Feb. 26, 2020, No. A157020) 45 Cal.App.5th 921, is vacated.  The petition for writ of habeas corpus is denied.

                                          _____

                                          BURNS, J.

WE CONCUR:


_____

JONES, ACTING P. J.*


_____

SIMONS, J.



A157020

---

\* Retired Presiding Justice of the Court of Appeal, First Appellate District, Division Five, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Superior Court of Sonoma County, No. SCR33484, Hon. Rene A. Chouteau

Donald McDowell, in pro. per., and Victor J. Morse, By Appointment of the First District Court of Appeal under the First District Appellate Project Independent Case System, for Petitioner.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Jeffrey M. Laurence, Senior Assistant Attorney General, Donna M. Provenzano, Supervising Deputy Attorney General, and David H. Rose, Deputy Attorney General, for Respondent.