Filed 10/7/21

CERTIFIED FOR PUBLICATION


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION TWO


| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>LOUIS RAMON MONTES,<br><br>     Defendant and Appellant. | E075064<br><br>(Super.Ct.No. FV1012901)<br><br>OPINION |


APPEAL from the Superior Court of San Bernardino County.  Michael A. Smith, Judge.  (Retired Judge of the San Bernardino Sup. Ct. assigned by the Chief Justice pursuant to art. VI, § 6 of the Cal. Const.)  Conditionally reversed with directions.

Cynthia M. Jones, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra and Rob Bonta, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Steve Oetting and Anthony Da Silva, Deputy Attorneys General, for Plaintiff and Respondent.


1

In 2003, defendant and appellant Louis Ramon Montes was convicted of, inter alia, the special circumstance murder of April Peake (the victim)—which he committed when he was 17 years old—and he was sentenced to life without the possibility of parole (LWOP). After the United States Supreme Court ruled in *Miller v. Alabama* (2012) 567 U.S. 460, 465 (*Miller*) that mandatory LWOP sentences for juveniles were prohibited, the California Supreme Court decided that juveniles sentenced to LWOP were entitled to a hearing in order to have an opportunity to present information as to juvenile characteristics and circumstances at the time the offense was committed. (*People v. Franklin* (2016) 63 Cal.4th 261; *In re Kirchner* (2017) 2 Cal.5th 1040 (*Kirchner*).) Defendant thus petitioned to recall his sentence pursuant to Penal Code[1] section 1170, subdivision (d)(2). The superior court granted the petition, recalled defendant's sentence, and resentenced him to LWOP.

In this appeal, defendant contends the superior court abused its discretion by applying the wrong legal standard during resentencing. He further contends the court should have sua sponte transferred this matter to the juvenile court for a transfer/fitness hearing pursuant to Proposition 57 (as approved by voters, Gen. Elec. (Nov. 8, 2016)).

---

[1] All section references are to the Penal Code unless otherwise indicated.

We reject defendant's first contention but find merit in the second.[2]  In supplemental briefing, the parties agree, and we concur, the minute order of the resentencing hearing must be corrected, and a new abstract of judgment should issue. Accordingly, we conditionally reverse defendant's sentence and remand for defendant to receive a transfer/fitness hearing in the juvenile court.

## I.  PROCEDURAL BACKGROUND AND FACTS

In early 2001, two gang members, defendant (age 17) and Ian Whitson (age 18), devised a plan to rob a pawnshop (owned by Whitson's girlfriend's father) and kill the owner.[3]  They recruited Matthew Moore to assist them.[4]  While defendant and Whitson planned to "steal [the victim's] car to commit [the] robbery and kill her in the process," Moore thought they were going to take the victim's car "'in a forcible way,' but not kill [her]."  The victim was a family friend who had been living with Whitson's girlfriend.

Shortly after midnight on January 9, 2001, the victim gave Whitson, defendant, and Moore a ride to Whitson's house.  On the way, Whitson directed her to drive to a construction site on a cul-de-sac so they could buy ecstasy pills.  Once the victim stopped

---

[2]  Defendant alternatively argues that, if this court "deems there is no sua sponte duty to order a juvenile transfer hearing, and the appellate challenge is therefore forfeited, [then defendant] received ineffective assistance of counsel."  Because we agree the superior court was required to transfer the matter to the juvenile court for a transfer/fitness hearing, and the People do not contend otherwise, defendant's ineffective assistance of counsel claim is moot.

[3]  Defendant remained a gang member until 2014.

[4]  Moore was also charged with murder, but he pleaded guilty to being an accomplice after the fact in exchange for his testimony.

3

her car at the site, defendant (who was sitting behind her) struck her over the head with a 12-inch crescent wrench. Defendant "'said that she wasn't knocking out,' and gave the wrench to Whitson" who struck her over the head for approximately two minutes. The victim fought back, and said, "'Please. I'll do anything,' but Whitson said, 'Die, bitch.'"

Defendant and Whitson dragged the victim to a trench and covered her with dirt. Either defendant or Whitson told Moore that they also struck the victim on the head with a rock, but Moore did not see that happen. The trio drove the victim's car to Whitson's house and went to sleep. The next day, they cleaned the wrench with bleach, washed their clothes, cleaned the interior of the victim's car, and burned certain items like the car seat covers.

On January 29, 2001, defendant was charged with, and on December 17, 2003, a jury convicted him of, first degree murder (§ 187, subd. (a), count 1), with true findings on the special circumstances of lying in wait, murder during the commission of a robbery, and murder during the commission of a carjacking (§ 190.2, subd. (a)(15), (a)(17)). The jury also found him guilty of carjacking (§ 215, subd. (a), count 2) and robbery (§ 211, count 3) and found that he personally used a deadly weapon, a wrench, in the commission of the murder, carjacking, and robbery (§ 12022, subd. (b)). On July 30, 2004, defendant was sentenced to LWOP.[5]

---

[5] Initially, the sentence included a determinate term for the carjacking conviction, plus enhancements; however, in defendant's direct appeal, we charged the trial court to stay that portion of the sentence under section 654. On April 20, 2006, defendant was resentenced to LWOP.

On September 5, 2017, defendant filed a petition for writ of habeas corpus in the Superior Court of San Bernardino County, seeking relief from his LWOP sentence under *Miller*, *supra*, 567 U.S. 460. That petition was denied as moot on October 23, 2017, because of the enactment of Senate Bill No. 394 (2017-2018 Reg. Sess.), which amended section 3051 (Stats. 2017, ch. 684, § 1.5) and established parole eligibility for juveniles serving LWOP terms.

Defendant filed a petition for writ of habeas corpus in this court, seeking the same relief. (See *In re Montes* (Sept. 11, 2019, E069533).) On October 31, 2018, we granted in part and denied in part the petition.[6] On February 13, 2019, the California Supreme Court granted review (*In re Montes*, S252994). On July 31, 2019, the matter was transferred back to this court for reconsideration in light of *In re Cook* (2019) 7 Cal.5th 439. On September 11, 2019, we denied the petition.

At the same time his petition for review was pending in the California Supreme Court, defendant also petitioned the superior court to recall his sentence pursuant to section 1170, subdivision (d)(2). The People opposed resentencing, but argued that, if the court proceeded to resentence defendant, it should again impose an LWOP sentence. A hearing on defendant's petition was conducted on January 24, February 28, and March 13, 2020. Defendant presented the testimony of two witnesses (his friend Heidi Combs and his sister Catherine Montes-Rafferty), and he testified on his own behalf. Following

_____

[6] We denied defendant's request to vacate the judgment pursuant to *Miller*, and his sentence remained valid because section 3051, subdivision (b)(4), made him eligible for parole during his 25th year of incarceration. However, we granted defendant's request for a hearing pursuant to *People v. Franklin*, *supra*, 63 Cal.4th 261.

argument by the parties, the court considered "some of the areas Counsel [had] been talking about in the elements of [section] 1170(d)(2)."**7** The court noted the *Miller*

---

**7** The court, in relevant part, stated: "[Defendant] was 17 years and 3 months old on the day of the offense. . . . Significantly, he did have a juvenile adjudication, and there were, originally, three counts—robbery, criminal threats, and grand theft—and the grand theft was the [one] found true. . . . So he was granted probation within the juvenile court system. [¶] Unlike now, he did not take advantage of the rehabilitative efforts in the juvenile court system. There was a revocation of probation. Probation was reinstated and [he] was . . . not reporting to the probation officer . . . . [¶] . . . [Defendant] became friends with Mr. Whitson while they were both in a juvenile placement facility. And, again, rather than taking advantage of the benefits of the rehabilitative efforts of the juvenile court system, both he and Mr. Whitson continued to pursue gang and criminal activities. . . . [O]nce they were released from the juvenile placement facility, [they] came up with a plan to kidnap [the victim], steal her car, then go . . . rob and kill [a pawn shop owner]. And if anyone else was present, kill them, as well. [¶] . . . [O]n January the 9th, 2001, [they] put their plan into action. . . . [After killing the victim and covering up the evidence], they still intended to carry out the robbery at the pawn shop. But then when they were told [the] police were at the pawn shop, looking for [the victim], they eventually abandoned their plan. [¶] So in looking at [section] 1170(d)(2), [one factor] is whether or not the defendant's conviction, or liability, for the homicide is based either on the felony-murder rule or an abiding, aiding theory; that is, if the defendant was not the actual perpetrator . . . his culpability is less . . . . [¶] That is not the case here. . . . The defendant premeditated the offense with Mr. Whitson. . . . [T]he . . . next factor is whether or not there were any juvenile adjudications or assaults or other offenses demonstrating a potential for injury to individuals, that is, to the defendant's favor in this case. There are no such juvenile adjudications. There is a juvenile adjudication for . . . grand theft, but the other charges were not sustained. [¶] The next factor . . . is whether or not the defendant committed the offense with an adult perpetrator. . . . [I]f there is an adult perpetrator . . . dominating or manipulating a juvenile, that again is a strong factor to justify a resentencing. While it is true that Mr. Whitson technically was just over the age of 18 at the time, he was not significantly older than the defendant, was not someone who was dominating or manipulating the defendant. . . . [¶] They were peers and became friends. And so . . . the basis for that factor really doesn't apply here. Another factor to consider is if the defendant, at the time of the offense, had insufficient adult supervision or adult support or appropriate adult role models or was a victim of physical or psychological trauma in the home. That is not the case here. [Defendant] lived in a home with both his mother and his father and sisters. It was a supportive home environment. [¶] [Defendant] was a good student, doing well, and then eventually hung out with the wrong people, wrong friends, wrong crowd, wrong motivations, and elected

*[footnote continued on next page]*

6

decision and observed that the decisional authorities did not completely prohibit LWOP

sentences for juveniles. Acknowledging the *Miller* factors—juveniles' immaturity, lack

of insight and judgment, failure to appreciate the gravity of the consequences of their

actions, susceptibility to peer pressure, and greater capacity for change—the court stated

---

not to . . . take advantage of the supportive home environment that he did have, and turned instead to alcohol and drugs and a gang. Another factor to consider is whether the defendant has cogitative limitation due to mental illness or adult disabilities. Again, that's not the case here. [¶] Another factor . . . is whether or not the defendant either has maintained or reestablished positive family ties, and that is present here. [Defendant] has reestablished positive family ties with his sister and to some extent his mother and a long-time family friend, which indicates he is turning away from those negative influences and turning back to the positive influences. [¶] . . . [Defendant] was sentenced on January 30th of 2004 to life in prison without the possibility of parole, plus an additional one year for use of a deadly weapon. In . . . his first several years in prison, he was, basically, continuing a criminal lifestyle, still involved with the gang, still involved in other activities. Most significantly, in 2011, he participated in the stabbing of another inmate, which the other inmate received 22 stab wounds, but did recover. Again, this was not a spontaneous situation that developed; rather, it was a planned attack. [¶] Shortly after that, however, it appears that [defendant] has turned away from that lifestyle. Starting in 2014, 2015, he dropped out of the gang and officially debriefed with the Department of Corrections. Since the 2011 stabbing, there have not been any significant disciplinary actions in prison. He's also been involved in AA and NA, and it appears that he is no longer using alcohol or drugs or associating with gang members, at least to the extent that he can do that in a prison setting. . . . [¶] As pointed out, in addition to those positive moves, [defendant] has also bettered himself. He has obtained his GED degree. He is working on his AA degree. He's actively and successfully involved in several group programs for his betterment. So he is . . . making significant stride towards rehabilitation. My concern at this point is that all those good things have been in the last . . . five to six years. . . . [¶] . . . If you continue on the same path that you are on now with no significant disciplinary actions, continuing the education, continuing the program, you are getting a little bit more insight into the—truly the enormity of the offense that you committed, and the enormity of the consequences of that—not just [the victim], who is dead, but her family and her friends. [¶] Their lives were changed forever as a result of that. You are right, you can't do anything to change that, but, I think, part of the rehabilitative process is to be able to truly appreciate that and recognize that, and then, as you say, the only thing you can do is make yourself in a better situation and not be in such a situation, and, hopefully, trying to help others avoid that."

7

it was aware the United States Supreme Court had indicated there had to be strong, specific factors to demonstrate irreparable corruption to warrant an LWOP sentence. However, the court found that section 3051 mooted the mandates of *Miller* because it provided juveniles with an opportunity for parole after 25 years of incarceration. Ultimately, the court recognized its option to resentence defendant to a term less than LWOP but chose not to exercise that option. According to the court, defendant's LWOP sentence remained appropriate because of his insignificant history of rehabilitation.

## II. DISCUSSION

*A. The Superior Court Applied the Correct Legal Standard During Resentencing.*

Defendant contends the superior court abused its discretion by "applying the wrong legal standard [during] resentencing." We disagree.

In *Miller*, *supra*, 576 U.S. 460, the United States Supreme Court held that "under the Eighth Amendment to the United States Constitution 'a state may authorize its courts to impose [a sentence of LWOP] on a juvenile homicide offender [only] when the penalty is discretionary and when the sentencing court's discretion is properly exercised . . . .'" (*Kirchner*, *supra*, 2 Cal.5th at p. 1042, quoting *People v. Gutierrez* (2014) 58 Cal.4th 1354, 1379 (*Gutierrez*).) "The proper exercise of discretion in this context requires the sentencing court to consider relevant evidence as may exist concerning factors that *Miller* identified as bearing on the 'distinctive attributes of youth' and how these attributes 'diminish the penological justifications for imposing the harshest sentences on juvenile offenders.'" (*Kirchner*, at p. 1042.)

"[U]nder *Miller* a sentencing court considering a sentence of [LWOP] for a juvenile offender must consider evidence that may exist regarding (1) 'a juvenile offender's "chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences'"; (2) '"the family and home environment that surrounds [the juvenile]—and from which he cannot usually extricate himself—no matter how brutal or dysfunctional'"; (3) '"the circumstances of the homicide offense, including the extent of [the juvenile defendant's] participation in the conduct and the way familial and peer pressures may have affected him'"; (4) 'whether the offender "might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys'"; and (5) 'the possibility of rehabilitation.'" (*Kirchner*, *supra*, 2 Cal.5th at p. 1048.) "'Because *Miller* determined that sentencing a child to [LWOP] is excessive for all but "'the rare juvenile offender whose crime reflects irreparable corruption,'" [citation], it rendered [a sentence of LWOP] an unconstitutional penalty for "a class of defendants because of their status"—that is, juvenile offenders whose crimes reflect the transient immaturity of youth.'" (*Id*. at pp. 1048-1049.)

At the time of defendant's resentencing, the parties and the superior court had the benefit of *Miller*, *Gutierrez*, and *Kirchner*, and the record reflects that the *Miller* factors

9

were discussed.[8]  Nonetheless, defendant complains that the court "treated the resentencing hearing as [if] there was a presumption of a sentence of LWOP that [defendant] was required to overcome."  Citing *Gutierrez*, *supra*, 58 Cal.4th at page 1387, he argues that by obtaining a recall under section 1170, subdivision (d)(2), and convincing the court that he has "shown a capacity for change and rehabilitation and is not incorrigible, it is an abuse of discretion and a violation of the constitution to again impose a sentence of LWOP."  We are not persuaded.

In *Gutierrez*, the California Supreme Court held "that section 190.5[, subdivision] (b) confers discretion on the sentencing court to impose either [LWOP] or a term of 25 years to life on a 16- or 17-year-old juvenile convicted of special circumstance murder,

---

[8] "So when I look at all these factors, there are factors both ways.  Under *Miller* . . . , which was the United States Supreme Court decision dealing with the issue of life in prison without the possibility of parole for juveniles, the United States Supreme Court did not prohibit life in prison without the possibility of parole, but, rather, basically said that that would be the exception rather than the rule; that normally juveniles are more immature, they are more impetuous, they lack insight and judgment, and they fail to appreciate the gravity of the consequences of their actions, and they are more susceptible to peer pressure, and they have greater capacity for change.  [¶]  We see those factors— certainly, his involvement in this did have to do with lack of insight, lack of judgment, and going along with the crowd, or the suggestions of Mr. Whitson, and we have seen a capacity for change and rehabilitation in [defendant].  So *Miller* indicated that if the offense was a result of those factors, demonstrating that the offense was, basically, the effect of transient immaturity of youth, the defendant should be given the opportunity to have a meaningful opportunity for parole.  But, if his participation in the offense and prior and subsequent action demonstrates an irreparable path of corruption, then life without the possibility of parole would still be the appropriate penalty, but the Supreme Court noted that would be the rare or uncommon result.  [¶]  And it was that decision that led the . . . California Legislature to adopt Penal Code Section 3051, basically, fulfilling the mandate of *Miller* to give juveniles the benefit of the presumption that the offense was more likely the result of transient immaturity and give them the opportunity— meaningful opportunity for parole after their 25 years of incarceration."

*with no presumption in favor of* [*LWOP*]." (*Gutierrez*, *supra*, 58 Cal.4th at p. 1387, italics added.) However, the Supreme Court "did not suggest section 190.5, subdivision (b) evinces a preference for a sentence of 25 years to life. Rather, the court determined that '[u]nder *Miller*, a state may authorize its courts to impose [a sentence of LWOP] on a juvenile homicide offender when the penalty is discretionary and when the sentencing court's discretion is properly exercised in accordance with *Miller*.'" (*People v. Palafox* (2014) 231 Cal.App.4th 68, 91.)

Here, the superior court expressly recognized that, under *Miller*, a sentence of LWOP is "the exception rather than the rule" because of the specific attributes associated with juveniles. Acknowledging the *Miller* factors—juveniles' immaturity, lack of insight and judgment, failure to appreciate the gravity of the consequences of their actions, susceptibility to peer pressure, and greater capacity for change—the court found defendant's involvement in murdering the victim had "to do with lack of insight, lack of judgment, and going along with the crowd, or the suggestions of Mr. Whitson." The court also observed "a capacity for change and rehabilitation in [defendant]." Recognizing that it could "consider the [section] 1170(d)(2)" petition and resentence defendant to 25 years to life instead of LWOP, the court declined to do so because defendant's rehabilitation was recent and short-term (five to six years). In other words, the court was not convinced that defendant's crime was a reflection of the transient immaturity of youth. (*Miller*, *supra*, 567 U.S. at p. 480.) We therefore reject defendant's claim the court abused its discretion in failing to apply the correct legal standard.

11

### B. *Defendant is Entitled to a Transfer/Fitness Hearing Under Proposition 57.*

Defendant contends that the recall of his sentence (§ 1170, subd. (d)(2)(E)) made him eligible for the benefits of Proposition 57 under *People v. Superior Court* (*Lara*) (2018) 4 Cal.5th 299 (*Lara*), such that the superior court had a sua sponte duty to transfer the matter to the juvenile court for a transfer/fitness hearing. The People disagree. They argue: (1) defendant's sentence was never recalled as unauthorized under section 1170, subdivision (d)(1), or vacated following a habeas corpus proceeding, (2) the superior court declined to impose a new sentence "'if any' as stated in section 1170, subdivision (d)(2)(E)," and (3) defendant was not entitled to the ameliorative benefits of Proposition 57 because his term remained unchanged. As we explain, we agree with defendant.

""'Historically, a child could be tried in criminal court only after a judicial determination, before jeopardy attached, that he or she was unfit to be dealt with under juvenile court law.'" [Citation.] In 1961, the Legislature set 16 years old as the minimum age that a minor could be transferred to criminal court. [Citations.] The age limit preventing prosecution of those younger than 16 in criminal court remained in place for close to 34 years.

"In 1995, California began to move away from the historical rule when the Legislature permitted some 14 and 15 year olds to be transferred to criminal court. [Citation.] This trend continued over the next five years and culminated with Proposition 21 in 2000. For specified murders and sex crimes, Proposition 21 required prosecutors to charge minors 14 years old or older directly in criminal court. [Citations.] For other

12

specified serious offenses, Proposition 21 provided prosecutors with discretion to charge minors 14 or older directly in criminal court instead of juvenile court.  [Citations.]

"In the years after the passage of Proposition 21, there was 'a sea change in penology regarding the relative culpability and rehabilitation possibilities for juvenile offenders, as reflected in several judicial opinions.'  [Citation.]  These changes were based upon developments in scientific research on adolescent brain development confirming that children are different from adults in ways that are critical to identifying age-appropriate sentences.  [Citations.]  In the same period, the California Legislature enacted numerous reforms reflecting a rethinking of punishment for minors." (*O.G. v. Superior Court* (2021) 11 Cal.5th 82, 88.)

In November 2016, Proposition 57 returned California to the historical rule by amending "'the Welfare and Institutions Code so as to eliminate direct filing by prosecutors.  Certain categories of [juveniles] . . . can still be tried in criminal court, but only after a juvenile court judge conducts a transfer hearing to consider various factors such as the [juvenile's] maturity, degree of criminal sophistication, prior delinquent history, and whether the minor can be rehabilitated.'" (*Lara*, *supra*, 4 Cal.5th at pp. 305-306.)  Proposition 57 is retroactive in that it applies to defendants whose judgments are not final.  (*Lara*, at p. 309; *In re Estrada* (1965) 63 Cal.2d 740, 745.)

Whether defendant is entitled to the ameliorative benefits of Proposition 57 depends on whether his resentencing under section 1170, subdivision (d), affected the finality of his judgment.  Last year, we considered this issue and concluded that it did not. (*People v. Federico* (2020) 50 Cal.App.5th 318, 328, review granted Aug. 26, 2020,

13

S263082 (*Federico*).)  In that case, the defendant pled guilty to assault with a deadly

weapon and, on April 18, 2008, he was sentenced to state prison for 20 years.  (*Id*. at

p. 322.)  In September 2018, the Department of Corrections and Rehabilitation

recommended the superior court resentence defendant under section 1170,

subdivision (d)(1).  (*Federico*, at p. 322.)  The defendant agreed with the

recommendation and requested a transfer/fitness hearing under Proposition 57.

(*Federico*, at p. 322.)  The superior court denied defendant's request and we affirmed.

(*Id*. at pp. 321, 323, 328.)

In *Federico*, we held that the defendant was not entitled to the ameliorative

benefits of Proposition 57 because his judgment became final when the deadline to

appeal the 2008 sentencing passed.  (*Federico*, *supra*, 50 Cal.App.5th at p. 325.)  We

rejected the argument that defendant's February 2019 resentencing hearing reopened the

judgment, concluding the "fact that he could appeal the court's [resentencing] decision

. . . [did] not render the 2008 judgment not final."  (*Id*. at p. 326.)  We determined that

resentencing under section 1170, subdivision (d), does not affect the finality of

defendant's original judgment for the purpose of retroactively applying Proposition 57.

(*Federico*, at p. 327.)  We explained that, "even if a trial court has authority to recall a

sentence under section 1170, subdivision (d), it does not follow that the sentence is not a

final judgment under *Estrada*" as "[s]ection 1170, subdivision (d), is an exception to [the]

common law rule" that a trial court loses jurisdiction to resentence a defendant once

execution of the sentence begins, and the statute says "nothing about 'reopening' a

14

judgment that has been final for years, in order to apply recently enacted laws retroactively." (*Federico*, at pp. 326-327.)

Finally, in *Federico*, we rejected the argument that the "full resentencing rule" pronounced in *People v. Buycks* (2018) 5 Cal.5th 857, 893 (*Buycks*) ["when part of a sentence is stricken on review, on remand for resentencing 'a full resentencing as to all counts is appropriate, so the trial court can exercise its sentencing discretion in light of the changed circumstances'"], permitted the superior court to consider any relevant circumstance, including the enactment of Proposition 57, when resentencing a defendant. (*Federico*, *supra*, 50 Cal.App.5th at p. 327.) We found *Buycks* inapplicable to the defendant's case because *Buycks* involved resentencing under Proposition 47, not Proposition 57. (*Federico*, at p. 327.) We further observed that none of the examples of the full resentencing rule's application identified in *People v. Valenzuela* (2019) 7 Cal.5th 415, 425, "expand the scope of the resentencing court's discretion on a section 1170, subdivision (d) recall in the manner claimed by [the] defendant." (*Federico*, at p. 328.)

Three courts have disagreed with *Federico* and thus created a split in authorities on the issue of the finality of a judgment for purposes of retroactive application of ameliorative changes to the law. (See *People v. Padilla* (2020) 50 Cal.App.5th 244, 253, 255-256, review granted Aug. 26, 2020, S263375 (*Padilla*) ["a collateral proceeding may reopen the finality of a sentence for retroactivity purposes, even while the conviction remains final," and Prop. 57 applies retroactively to defendant's nonfinal sentence]; *People v. Lopez* (2020) 56 Cal.App.5th 835, 845, review granted Jan. 27, 2021, S265936 (*Lopez*) [resentencing under § 1170, subd. (d)(1), "replaces the original sentence" such

15

that the "finality of the original sentence is no longer material"]; *People v. Hwang* (2021) 60 Cal.App.5th 358, 366-367, review granted Apr. 14, 2021, S267274 (*Hwang*) [resentencing under § 1170, subd. (d)(1), replaces the original sentence; the new sentence is not final because the defendant may obtain review from the California Supreme Court or the United States Supreme Court; and because defendant's judgment is no longer final he is entitled to the ameliorative benefits of Prop. 57].) On further reflection, we now conclude a resentencing under section 1170, subdivision (d), results in a new sentence— the judgment is no longer final—which entitles the defendant to the ameliorative benefits of Proposition 57.

Our retraction from our previous position in *Federico* is based on the analyses in *Padilla*, *Lopez*, and *Hwang*, which we find persuasive. "In a criminal case, judgment is rendered when the trial court orally pronounces sentence." (*People v. Karaman* (1992) 4 Cal.4th 335, 344, fn. 9; see *People v. McKenzie* (2020) 9 Cal.5th 40, 46 ["In criminal actions, the terms 'judgment' and '"sentence"' are generally considered 'synonymous' [citation], and there is no 'judgment of conviction' without a sentence"].) A resentencing under section 1170, subdivision (d)(2)(E), makes the original sentence no longer operative because resentencing replaces the original sentence, and the defendant may seek review from a higher court. Section 1170, subdivision (d)(2)(E)'s instruction that the resentencing court should "'*resentence* the defendant in *the same manner* as if the defendant had not previously been sentenced'" does not mean that the resentencing court may only "reconsider its sentencing choices in the original sentence" without regard to any intervening changes in the law. (*Federico*, *supra*, 50 Cal.App.5th at p. 327.) Rather,

16

it means "that the resentencing court should not consider itself bound by any aspect of the previous sentence." (*Lopez*, *supra*, 56 Cal.App.5th at p. 846.) This reading is consistent with the language in section 1170, subdivision (d)(2)(F)(vi)-(viii), which allows the resentencing court to consider postconviction matters, and it is consistent with the full resentencing rule described in *Buycks*. (*Buycks*, *supra*, 5 Cal.5th at pp. 893-894; *People v. Ramirez* (2019) 35 Cal.App.5th 55, 64 [under the full resentencing rule, a remittitur gives the trial court "jurisdiction to consider any and all factors that would affect sentencing," including the effect of Prop. 57].)

In short, because we conclude defendant's resentencing pursuant to section 1170, subdivision (d), effectively vacated the earlier judgment, it follows that Proposition 57 applies retroactively to defendant's nonfinal sentence and requires that he receive a transfer/fitness hearing. (See *Lara*, *supra*, 4 Cal.5th at p. 303; *People v. Ramirez*, *supra*, 35 Cal.App.5th at p. 64 ["a juvenile defendant entitled to the benefit of Proposition 57 cannot be 'sentenced as an adult,' if the juvenile court has not transferred the juvenile to adult court."].)

*C. The Sentencing Minute Order Must Be Corrected and A New Abstract of Judgement Must Issue.*

Defendant argues, the People concede, and we agree the March 13, 2020 minute order contains two clerical errors, which must be corrected.{Supp AOB 6, 7; Supp RB 4} The parties further agree, and we concur, a new abstract of judgment must be issued.

Defendant was resentenced on March 13, 2020. The minute order provides: "Restitution fine pursuant to PC 1202 and PC 1202.45 is reduced to $2,000.00 each. PC

17

1202.45 is stayed." However, section 1202 refers to pronouncement of judgment; and section 1202.4 applies to restitution fines. Thus, the reference to section 1202 is in error. The correct statutory basis for the restitution fine is section 1202.4. Also, the minute order states that the superior court imposed and stayed a parole revocation fine under section 1202.45, despite defendant's sentence of LWOP. The court erred in imposing this fine. (See *People v. Gonzalez* (2016) 246 Cal.App.4th 1358, 1386 [because the defendants "were sentenced to life imprisonment without the possibility of parole, parole revocation fines are inapplicable"]; *People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1184 [where the defendant is "sentenced to life without the possibility of parole, there can be no parole, and therefore the parole revocation fine was improperly assessed"].) Thus, "the parole revocation fine, even though suspended, is unauthorized and must be stricken." (*People v. Carr* (2010) 190 Cal.App.4th 475, 482, fn. 6; see *People v. Ybarra* (2008) 166 Cal.App.4th 1069, 1097, disapproved on another ground in *People v. Gutierrez* (2014) 58 Cal.4th at 1354, 1370.)

No abstract of judgment was issued following defendant's resentencing on March 13, 2020. Section 1213 provides: "(a) . . . if [a] judgment is for imprisonment in the state prison or imprisonment pursuant to subdivision (h) of Section 1170, *either a copy of the minute order or an abstract of the judgment* as provided in Section 1213.5, certified by the clerk of the court, and a Criminal Investigation and Identification (CII) number *shall be forthwith furnished to the officer whose duty it is to execute the . . . judgment*, and no other warrant or authority is necessary to justify or require its execution. [¶] (b) *If a copy of the minute order is used as the commitment document, the first page or pages shall be*

*identical in form and content to that prescribed by the Judicial Council for an abstract of judgment*, and other matters as appropriate may be added thereafter." (Italics added.) The March 13, 2020 minute order did not relieve the superior court of its obligation to ensure that an abstract of judgment summarize the judgment because the order was not the commitment document. Additionally, the order contained clerical errors and did not comply with statutory requirements for a commitment document because it was not "*identical in form and content to that prescribed by the Judicial Council for an abstract of judgment*." (§ 1213, subd. (b), italics added.) Accordingly, we direct the superior court to issue a new abstract of judgment that reflects defendant's sentence of LWOP, the restitution fine was pursuant to section 1202.4, and the parole revocation fine under section 1202.45 was stricken.

## III. DISPOSITION

The judgment is conditionally reversed. The matter is remanded to the superior court with directions to refer the case, no later than 30 days from the filing of the remittitur, to the juvenile court for a transfer/fitness hearing, to determine if it would have transferred the case to adult criminal court had it originally been filed in the juvenile court in accordance with current law.

19

If the juvenile court determines it would not have transferred defendant to criminal court under current law, it shall treat defendant's convictions as juvenile adjudications as of the date defendant was convicted and impose an appropriate disposition within its usual timeframe.

If the juvenile court determines it would have transferred defendant to adult criminal court, it shall transfer the case to criminal court, which shall then (1) reinstate defendant's sentence, (2) correct the March 13, 2020 minute order and issue an abstract of judgment so that both reflect defendant's sentence of LWOP, the restitution fine was pursuant to section 1202.4, and the parole revocation fine under section 1202.45 was stricken, and (3) forward a certified copy of the abstract of judgment to the Department of Corrections and Rehabilitation.

CERTIFIED FOR PUBLICATION


McKINSTER
Acting P. J.

We concur:


SLOUGH
J.


MENETREZ
J.


20